C-07-3698-(CW)

**FILED**

JUL 1 8 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SF

EXHIBIT

A

VINCENT SMITH

V.

JOHN SALAZAR, WARDEN (A)

STATE OF CALIFORNIA
## BPT 1040 APPEAL RECEIPT

B1-B2-5u

DEPARTMENT OF CORRECTIONS
CDC 128-B

| INMATE NAME | NUMBER |
|---|---|
| SMITH, VINCENT | C-99842 |

This will serve as notification that your BPT 1040 Appeal was received by Folsom State
Prison Records Department on 12 / 8 / 03 . It has been assigned Log Number:
_____F03-077_____ . Your appeal was forwarded to the Board of Prison Terms, Office of
Policy and Appeals on 12 / 10 / 03 . Any future inquiries regarding this appeal should
be sent to:    Board of Prison Terms
                Office of Policy and Appeals
                1515 K Street, Suite 600
                Sacramento, CA 95814

| STAFF NAME | TITLE | INSTITUTION |
|---|---|---|
| ~~I. Hernandez~~ S. Quast | Office Assistant (T) | Folsom State Prison |

DATE:    12-10-03                          GENERAL CHRONO

A-1

BOARD OF PRISON TERMS
APPEAL SCREENING NOTICE

STATE OF CALIFORNIA

YOUR APPEAL IS BEING SENT BACK TO YOU FOR THESE REASONS:

TO:   SMITH, Vincent
      C99842                           Log No.: F03-077
      ~~FOL~~ *CUSP*

[  ]  1. The Board does not have the power to change this.

[  ]  2. You already sent an appeal about this.          Received:
         [ ] We are still looking at your first appeal    Log No.:
         [ ] We made a decision about your first appeal.   Completed:

[  ]  3. Your appeal was not written correctly.

[ X ] 4. You sent your appeal too late and did not explain why.   Date sent: 12/7/03

According to your records, your latest parole consideration hearing was held on 7/9/03. Your
appeal was submitted on 12/7/03. You had 90 days in which to submit an appeal and you have
failed to meet the time limitations. The appeal is dismissed as untimely.

[  ]  5. Other:

Appeals Staff: *Monica Rodriguez*            Date: 12/16/03
Instructions to Staff:
CDC staff to assist in reviewing appeal decision        [ ] yes     [ X ] no

DISTRIBUTION:  White – Inmate/Parolee
               Canary – C-File
BPT 1043 (REV. 01/02)                                    Pink - BPT

A - 2

STATE OF CALIFORNIA
**BPT 1040 APPEAL RECEIPT**                    1-B2-05u                DEPARTMENT OF CORRECTIONS
                                                                      CDC 128-B

| INMATE NAME | NUMBER |
|---|---|
| SMITH | C- 99842 |

This will serve as notification that your BPT 1040 Appeal was received by Folsom State Prison Records Department on __1 / 7 /04__ . It has been assigned Log Number: __F03-077__ . Your appeal was forwarded to the Board of Prison Terms, Office of Policy and Appeals on __1 / 8 / 04__ . Any future inquiries regarding this appeal should be sent to:   Board of Prison Terms
                                 Office of Policy and Appeals
                                 1515 K Street, Suite 600
                                 Sacramento, CA 95814

| STAFF NAME | TITLE | INSTITUTION |
|---|---|---|
| ~~T. Hernandez~~ J. Quast | Office Assistant (T) | Folsom State Prison |

DATE:  1-8-04                              **GENERAL CHRONO**

A - 3

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                    ARNOLD SCHWARZENEGGER, *GOVERNOR*

# BOARD OF PRISON TERMS

1515 K Street, 6th Floor
Sacramento, CA 95814

April 15, 2005

Vincent Smith, C99842
Chuckawalla Valley State Prison
P.O. Box 2289
19025 Wileys Well Road
Blythe, CA 92225

Dear Mr. Smith:

This is in response to your letter submitted on October 27, 2004. According to our records your appeal from 2003 was completed on December 16, 2003. We have attached another copy for your convenience.

Effective May 1, 2004, the Board of Prison Terms Appeals section (15 CCR § 2050-2056) was repealed by Administrative Directive No. 04/01. The Board of Prison Terms no longer has an Appeals Unit; therefore, the decisions or actions regarding the issues listed below **cannot be appealed** and will no longer be addressed by the Board, regardless of whether the issues are written on a BPT 1040, a CDC 602, or in letter format:

- Due process issues including, but not limited to, hearing scheduling/postponements, etc.
- Hearing panel issues
- Mitigating factors of parole suitability
- CDC clerical errors regarding date/time/credit calculations
- CDC staff related issues (prison transfers, programming)
- Parole consideration (grant/denial of parole)
- Psychological/psychiatric evaluations, Board reports
- Court issues (recall of sentence)
- Attorney representation

You may go directly to the courts per California Department of Corrections, 15 CCR § 3160, Inmate Access to the Courts. Forms are available at the institution's law library. Issues concerning clerical errors on the BPT 1001 Life Prisoner Decision Face Sheet form related to Board decisions, and other rules of law, can be reviewed by the Board. You can submit these concerns via correspondence to the Board of Prison Terms, Quality Control Unit, 1515 "K" Street, Sixth Floor, Sacramento, California, 95814.

Sincerely,

*Monica Perez*

Monica Perez
Quality Control Analyst

A-4

EXHIBIT

"B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )        CDC Number C-99842
Hearing of:                )
                           )
VINCENT SMITH              )        **COPY**
———————————————————————————)
                                    **INMATE**

FOLSOM STATE PRISON

REPRESA, CALIFORNIA

JULY 9, 2003

3:35 P.M.

PANEL PRESENT:

JONES MOORE, Presiding Commissioner
PEGGY BACHLOR, Deputy Commissioner

OTHERS PRESENT:

VINCENT SMITH, Inmate
CANDICE CHRISTENSEN, Attorney for Inmate
JON HOPKINS, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

    √    No            See Review of Hearing
—————    Yes           Transcript Memorandum

Patty Davis                **Capitol Electronic Reporting**

ii.

## INDEX

Page

Proceedings ...................................... 1

Case Factors ..................................... 7

Pre-Commitment Factors ........................... 23

Post-Commitment Factors .......................... 25

Parole Plans ..................................... 39

Closing Statements ............................... 50

Recess ........................................... 60

Decision ......................................... 61

Adjournment ...................................... 66

Transcriber Certification ........................ 67

--oOo--

1

<pre>
 1              P R O C E E D I N G S

 2          DEPUTY COMMISSIONER BACHLOR:  We're on the

 3      record, Sir.

 4          PRESIDING COMMISSIONER MOORE:  All right.

 5      Thank you.  This is a Subsequent Parole

 6      Consideration Hearing for Vincent Smith.  CDC

 7      number, C as in Charlie, 99842.  Date of the

 8      hearing would be July the 9th, 2003.  And the time

 9      is approximately fifteen thirty-five hours.  The

10      location would be the Folsom State Prison.  The

11      legal status of the prisoner, the date the prisoner

12      was received would be January the 29th of 1985.

13      The date the life term started would be

14      September 12th of 1985, from the County of Lake.

15      The offense would be murder second with the use of

16      a firearm.  Case number would be CR, Charles,

17      Robert, 1757.  And that would be count one.  Penal

18      Code Section violated would be 187, second and

19      12022.5.  The term would be 17 to life and the

20      minimum eligible parole date would be July -- no,

21      strike that -- September 8th of 1994.  This hearing

22      will be tape recorded, sir.  And for voice

23      recognition purposes, we will state our full name,

24      spelling our last name, stating the purpose of our

25      business.  When it's your turn, if you would, add

26      your CDC number, please.

27          INMATE SMITH:  Okay.
</pre>

2

1    PRESIDING COMMISSIONER MOORE:  We'll go

2    around the room to my left.  My name is Jones

3    Moore, M-O-O-R-E, Commissioner, Board of Prison

4    Terms.

5    DEPUTY COMMISSIONER BACHLOR:  Peggy Bachlor.

6    It's B-A-C-H-L-O-R, Deputy Commissioner, Board of

7    Prison Terms.

8    DEPUTY DISTRICT ATTORNEY HOPKINS:  Jon

9    Hopkins, Chief Deputy District Attorney, Lake

10   County.  The first name is spelled J-O-N, last

11   name, H-O-P-K-I-N-S.

12   ATTORNEY CHRISTENSEN:  Candice Christensen,

13   C-H-R-I-S-T-E-N-S-E-N, attorney for Mr. Smith.

14   INMATE SMITH:  Vincent Smith, S-M-I-T-H, CDC

15   number is C-99842, inmate.

16   PRESIDING COMMISSIONER MOORE:  Thank you,

17   sir.  And let the record show, Mr. Smith, that

18   there are -- is a correctional peace officer in the

19   room who is here strictly for safety security

20   measures.  And she'll play no role in today's

21   proceedings.  Now, let me see.  1073, that's the

22   ADA form.  You signed that on March the 6th of

23   2003, saying you had no disabilities as defined by

24   the Americans With Disabilities Act.  Is that

25   accurate?

26   INMATE SMITH:  That's correct.

27   PRESIDING COMMISSIONER MOORE:  Is it still

3

1  current and accurate today?  You still have no

2  disabilities?

3          INMATE SMITH:  No disabilities.

4          PRESIDING COMMISSIONER MOORE:  And you made

5  it here today under your own power?

6          INMATE SMITH:  Yes, Sir.

7          PRESIDING COMMISSIONER MOORE:  All right.  I

8  note you're wearing glasses.  You need those to see

9  with?

10          INMATE SMITH:  It helps.

11          PRESIDING COMMISSIONER MOORE:  Okay.  Do

12  they help you with reading as well?

13          INMATE SMITH:  With reading.

14          PRESIDING COMMISSIONER MOORE:  All right.

15  Great.  I have a document there I want to ask you

16  to read here in just a second.  How about hearing?

17  Do you have any hearing problems?

18          INMATE SMITH:  No.

19          PRESIDING COMMISSIONER MOORE:  All right.

20  And what about psychotropic medications?

21          INMATE SMITH:  None.

22          PRESIDING COMMISSIONER MOORE:  None.  All

23  right.  If you would, the roman numeral two there,

24  the highlighted area in yellow, if you'd read that

25  aloud for us for the record.

26          INMATE SMITH:  The Americans With

27  Disabilities Act, ADA, is a law to help people with

4

1  disabilities.  Disabilities are problems that make
2  it harder for some people to see, hear, breathe,
3  talk, walk, learn, think, work or take care of
4  themselves than it is for others.  Nobody can be
5  kept out of public places or activities because of
6  a disability.  If you have a disability, you have
7  the right to ask for help to get ready for your BPT
8  hearing, get to the hearing, talk, read forms and
9  papers, and understand the hearing process.  BPT
10  will look at what you ask for to make sure that you
11  have a disability that is covered by the ADA and
12  that you have asked for the right kind of help.  If
13  you do not get help or if you don't think you got
14  the kind of help you need, ask for a BPT 1074
15  Grievance Form.  You can also get help to fill it
16  out.

17       ATTORNEY CHRISTENSEN:  Thank you.

18       PRESIDING COMMISSIONER MOORE:  Thank you,
19  sir.  Now, Counsel, in my review of the source
20  documents, I found no additional ADA concerns.  Is
21  that accurate?

22       ATTORNEY CHRISTENSEN:  I know of none, yes.
23       PRESIDING COMMISSIONER MOORE:  All right.
24  Thank you.  Now, Mr. Smith, the purpose of today's
25  hearing is to consider your suitability for parole.
26  We will consider the crime, the prior criminal and
27  social history, and your behavior and programming

5

1    since your commitment.  We have reviewed your

2    Central File and your prior transcript and you will

3    have an opportunity to correct or clarify them for

4    the record.  We will consider your progress since

5    your last hearing, any new psychiatric reports and

6    any other information that may have a bearing on

7    your suitability for parole.  Any change in your

8    parole plans should be brought to our attention.

9    Before we recess for deliberations, the District

10   Attorney, your attorney and you will have an

11   opportunity to make a final statement regarding

12   parole suitability and the length of confinement.

13   After this is done, we will recess, clear the room

14   and deliberate.  Once we've completed our

15   deliberations, Mr. Smith, then we will resume the

16   hearing and announce our decision.  The Board of

17   Prison Terms' rules and the law state that a parole

18   date should be denied if your release should pose

19   an unreasonable risk of danger to others.  All

20   right.  Now, Counsel, the prisoner has certain

21   rights.  Have those rights been met thus far?

22            ATTORNEY CHRISTENSEN:  Yes, they have.

23            PRESIDING COMMISSIONER MOORE:  Any

24   objections to the Panel members?

25            ATTORNEY CHRISTENSEN:  No.

26            PRESIDING COMMISSIONER MOORE:  And we've

27   already ascertained that the prisoner signed BPT

6

1   Form 1073 on March the 6th of 2003.  All right.

2   Now, Mr. Smith, you will receive a copy of our

3   written tentative decision today.  The decision

4   becomes effective in 120 days.  Copies of the

5   transcript and the decision will be sent to you.

6   And you'll have 90 days from that effective date to

7   appeal if you so desire.  You're not required to

8   discuss your offense nor are you required to admit

9   your offense.  However, the Panel does accept as

10  true the findings of the court meaning that we

11  won't retry the case.  We accept those facts that

12  was given to us here today.  Commissioner, any

13  confidential materials to be used today?

14       **DEPUTY COMMISSIONER BACHLOR:**  No, there's

15  not.

16       **PRESIDING COMMISSIONER MOORE:**  Thank you.

17  Now, let's see.  Exhibit Checklist Number One,

18  Counsel, did I give that to you?  I guess I didn't,

19  did I.  Here it is.  I haven't handed it to you

20  yet.  Let's see.  Do you have those documents, any

21  additional documents to submit or any preliminary

22  objections at this time?

23       **ATTORNEY CHRISTENSEN:**  I have all these

24  documents, no additional documents and no

25  preliminary objections.

26       **PRESIDING COMMISSIONER MOORE:**  Okay.

27  (indiscernible) passed it over to Mr. Hopkins.

7

1          DEPUTY DISTRICT ATTORNEY HOPKINS:  Yes, I
2    have them.  Thank you.

3          PRESIDING COMMISSIONER MOORE:  All right.
4    Thank you, sir.  Now, Mr. Smith, will you be
5    speaking with us today?

6          INMATE SMITH:  Yes, I will.

7          PRESIDING COMMISSIONER MOORE:  Raise your
8    right hand, please, and I'll swear you in.  Do you
9    solemnly swear or affirm the testimony you give at
10   this hearing will be the truth, the whole truth and
11   nothing but the truth, sir?

12         INMATE SMITH:  Yes, I do.

13         PRESIDING COMMISSIONER MOORE:  Thank you.
14   You can put your hand down now.  Let's see.  If
15   there are no objections, Counsel, I'm going to
16   incorporate by reference today the Statement of
17   Facts from the transcript of the decision that was
18   held on April 16th of '96 --

19         ATTORNEY CHRISTENSEN:  No objections.

20         PRESIDING COMMISSIONER MOORE:  -- pages nine
21   through 12.  All right.  Now, Mr. -- let's see
22   -- let me see here.  All right, Mr. Smith.  We've
23   gotten preliminaries out of the way, sir.  And in
24   essence, let's see -- The victim's name was Robert
25   Darling.

26         INMATE SMITH:  Yes.

27         PRESIDING COMMISSIONER MOORE:  He was 23.

8

1       INMATE SMITH:  Yes.

2       PRESIDING COMMISSIONER MOORE:  And this was

3  July the 6th of 1984.

4       INMATE SMITH:  I believe it was July the 7th

5  of 1984.

6       PRESIDING COMMISSIONER MOORE:  Okay.  That's

7  close enough for me.  Let's see, you arrived at

8  Annette Miller's cabin where the victim was

9  visiting.

10       INMATE SMITH:  Yes.

11       PRESIDING COMMISSIONER MOORE:  And at

12  approximately 7:00 p.m., you went to your pickup

13  truck and returned to the cabin with a loaded

14  rifle.

15       INMATE SMITH:  Yes.

16       PRESIDING COMMISSIONER MOORE:  A 22-caliber.

17       INMATE SMITH:  Yes.

18       PRESIDING COMMISSIONER MOORE:  Shot the

19  victim some multiple times, says here between 14 to

20  16 times.

21       INMATE SMITH:  Yes.

22       PRESIDING COMMISSIONER MOORE:  You shot him

23  in the head and in the body causing his demise.

24       INMATE SMITH:  That's correct.

25       PRESIDING COMMISSIONER MOORE:  Is that

26  accurate?

27       INMATE SMITH:  Yes, that's correct.

9

1        PRESIDING COMMISSIONER MOORE:   Okay.   And

2   you did shoot him?

3        INMATE SMITH:   Yes, I did.

4        PRESIDING COMMISSIONER MOORE:   Why so many

5   times?

6        INMATE SMITH:   I was afraid of him.   I was

7   afraid that he was going to try and rape Annette.

8        PRESIDING COMMISSIONER MOORE:   You were

9   afraid and you were afraid that he was going to

10  rape Annette.   Okay.   And why were you so afraid?

11       INMATE SMITH:   Well, about three months

12  prior to this happening, we had a birthday party at

13  Red's cabin for me.   And at that party was this

14  other friend of mine, Terri Taylor.   Well, after

15  everybody had left that party, Red prevented her

16  from leaving.   Red is Robert Darling.

17       PRESIDING COMMISSIONER MOORE:   I kind of

18  figured that.

19       INMATE SMITH:   He attempted to rape her.

20  And she managed to get away by biting him.   So back

21  to the crime itself, when he was over there, he was

22  making some rude comments to Annette, grabbing at

23  her.   And she'd ask me to ask him to leave, which I

24  did, and he refused saying that he wasn't going to

25  leave until he got him some.   So I believed that

26  based on that that he was going to try and force

27  himself on -- force himself on her sexually.

10

1      PRESIDING COMMISSIONER MOORE:  So, I'm

2  sorry.  What was the lady's name?

3      INMATE SMITH:  Annette Miller or Terri

4  Taylor?

5      PRESIDING COMMISSIONER MOORE:  Ms. Taylor.

6  Did she report that?

7      INMATE SMITH:  No, she didn't.

8      PRESIDING COMMISSIONER MOORE:  Why didn't

9  she report that?

10      INMATE SMITH:  I don't know.

11      PRESIDING COMMISSIONER MOORE:  And were you

12  there?

13      INMATE SMITH:  No, I had left when that

14  occurred.

15      PRESIDING COMMISSIONER MOORE:  So this is

16  all hearsay as far you know?

17      INMATE SMITH:  Yes, that's correct.

18      PRESIDING COMMISSIONER MOORE:  But you

19  believed it to be so.

20      INMATE SMITH:  I believed it to be true,

21  yes.  I saw the bite mark on Red's arm the next

22  day.

23      PRESIDING COMMISSIONER MOORE:  Okay.

24      INMATE SMITH:  And he never denied it.

25      PRESIDING COMMISSIONER MOORE:  He never

26  denied it.  Okay.  You saw a bite mark.  That was

27  it, huh?

11

1        INMATE SMITH:  Yes.

2        PRESIDING COMMISSIONER MOORE:  Okay.  So by

3   this action, you believed it to be so -- for what

4   you had seen by the one bite mark?

5        INMATE SMITH:  Yes, and from what Terri had

6   said.

7        PRESIDING COMMISSIONER MOORE:  And from what

8   she had told you.

9        INMATE SMITH:  And Red never denied doing

10  it.

11       PRESIDING COMMISSIONER MOORE:  Okay.  So you

12  asked him about it?

13       INMATE SMITH:  He was right there when Terri

14  told everybody else about it.

15       PRESIDING COMMISSIONER MOORE:  Okay.  And

16  because he didn't respond, he was guilty.

17       INMATE SMITH:  Well, I guess I assumed that,

18  yes.

19       PRESIDING COMMISSIONER MOORE:  Sometimes the

20  better of valor is not to make any comment at all.

21       INMATE SMITH:  This is true.

22       PRESIDING COMMISSIONER MOORE:  Especially if

23  it doesn't deserve a response.  Okay.  So how long

24  prior to this other incident did that take place?

25       INMATE SMITH:  About three months prior.

26       PRESIDING COMMISSIONER MOORE:  So that was

27  about three months -- about 90 days, huh?

12

1          INMATE SMITH:  Yes.

2          PRESIDING COMMISSIONER MOORE:  Okay.  So now

3    we get to this particular event.  What led you to

4    believe that she was going to be this time --

5    Ms. Miller was going to be attacked this time?

6          INMATE SMITH:  By his actions of grabbing

7    her and making rude comments to her -- sexual

8    comments.  And when I had asked him to leave at the

9    request of Ms. Miller, he stated that, no, he was

10   going to stay right there until he got him some.

11         PRESIDING COMMISSIONER MOORE:  All right.

12   So now, he made this comment.  He was going to stay

13   until he got some, right?

14         INMATE SMITH:  Correct.

15         PRESIDING COMMISSIONER MOORE:  And then that

16   was when you went out, got your rifle.

17         INMATE SMITH:  Yes.

18         PRESIDING COMMISSIONER MOORE:  Okay.

19         INMATE SMITH:  I don't remember actually

20   shooting him, but that's -- from that point until

21   the next thing that I remember when I was throwing

22   the gun at the truck.  That's basically how things

23   evolved.

24         PRESIDING COMMISSIONER MOORE:  Okay.  Now

25   were you intoxicated at this time?

26         INMATE SMITH:  Yes, I was.

27         PRESIDING COMMISSIONER MOORE:  On?

13

1    INMATE SMITH:  On alcohol and

2    methamphetamines.

3        PRESIDING COMMISSIONER MOORE:  Now, when did

4    you start this consumption?

5        INMATE SMITH:  Alcohol, I had started about

6    16 or 17.  Methamphetamine, probably about --

7        PRESIDING COMMISSIONER MOORE:  No, no.  I

8    was referring to that day.  I'll get to that later

9    on about when you started using.

10       INMATE SMITH:  Sorry.

11       PRESIDING COMMISSIONER MOORE:  That's all

12   right.  I meant that particular day of the event in

13   '84 there.  Can you remember?

14       INMATE SMITH:  I pretty much had been using

15   methamphetamine all week and had been drinking all

16   week and hardly had any sleep for that whole week

17   -- Fourth of July weekend.

18       PRESIDING COMMISSIONER MOORE:  You was

19   pretty wired up?

20       INMATE SMITH:  Yes.

21       PRESIDING COMMISSIONER MOORE:  Yeah.  So now

22   you'd already heard all this other stuff -- police.

23   Well, I guess -- Let me ask this.  If you was using

24   all these drugs or whatnot, how did you remember

25   all that?

26       INMATE SMITH:  I have a very good memory.

27       PRESIDING COMMISSIONER MOORE:  You have a

14

1   very good memory.  I mean, three months before, the

2   victim had supposedly attacked another lady, a

3   friend of yours.

4        INMATE SMITH:  Yes.

5        PRESIDING COMMISSIONER MOORE:  And then this

6   particular evening, he was attacking Ms. Miller.

7   And you were using early -- from earlier in the

8   morning -- earlier in the day --

9        INMATE SMITH:  Yes.

10       PRESIDING COMMISSIONER MOORE:  Right?

11       INMATE SMITH:  Pretty much the night before.

12       PRESIDING COMMISSIONER MOORE:  Yeah.  So

13   then you go to your vehicle and you get your gun --

14   your rifle -- a 22, fully loaded.  What kind of

15   rifle was it?

16       INMATE SMITH:  It was a Glenfield semi-

17   automatic.

18       PRESIDING COMMISSIONER MOORE:  Semi-

19   automatic.  How many rounds in the clip?

20       INMATE SMITH:  About 18 in the clip, one in

21   the chamber.

22       PRESIDING COMMISSIONER MOORE:  One in the

23   chamber.  It was scoped, too, wasn't it?

24       INMATE SMITH:  Yeah.  Yes, it was.

25       PRESIDING COMMISSIONER MOORE:  So why didn't

26   you -- Why didn't you call the sheriff?

27       INMATE SMITH:  That's what I should've done.

15

1    I could've gotten Annette to come with me.  I just

2    didn't think.  I didn't use any judgment

3    whatsoever.

4         PRESIDING COMMISSIONER MOORE:  Had you had a

5    confrontation with Mr. Darling before?

6         INMATE SMITH:  No.  No, we never had a

7    confrontation before.  In fact, we'd been pretty

8    good friends.

9         PRESIDING COMMISSIONER MOORE:  Okay.  You

10   say you were a somewhat friend.

11        INMATE SMITH:  Yes.

12        PRESIDING COMMISSIONER MOORE:  Somewhat

13   friends.  Okay.  So now, I'm still trying to

14   understand why you -- you just went out to the

15   truck and came back with your rifle loaded.  Was it

16   already loaded in the truck?

17        INMATE SMITH:  Yes, it was.

18        PRESIDING COMMISSIONER MOORE:  Ain't that

19   illegal?

20        INMATE SMITH:  Yes.

21        PRESIDING COMMISSIONER MOORE:  Okay.

22   Because you didn't even taken time to load it

23   because it was already loaded.

24        INMATE SMITH:  It was already loaded, yes.

25        PRESIDING COMMISSIONER MOORE:  And then you

26   just walked back in and shot him a couple of two or

27   three times and (indiscernible), then shot him in

16

1    the head.

2         INMATE SMITH:  I don't remember doing the

3    actual shooting itself.  He was shot numerous

4    times.

5         PRESIDING COMMISSIONER MOORE:  Did you make

6    any comment to him about, hey, stop, get out,

7    leave, do something?

8         INMATE SMITH:  I had asked him to leave.

9         PRESIDING COMMISSIONER MOORE:  No, but I

10   meant with the rifle in your hand?

11        INMATE SMITH:  I don't remember if I did or

12   not.  I think I've pretty much blocked that out of

13   my memory.  It something I wouldn't want to

14   remember.

15        PRESIDING COMMISSIONER MOORE:  Why is that?

16        INMATE SMITH:  I killed somebody.  I killed

17   somebody that was a friend for -- I mean, it should

18   have never happened.

19        PRESIDING COMMISSIONER MOORE:  Okay.  Okay.

20   I agree with you.  It should've never happened.  So

21   this was because you were trying to protect

22   Ms. Miller?

23        INMATE SMITH:  Yes.

24        PRESIDING COMMISSIONER MOORE:  To keep her

25   from being harmed?

26        INMATE SMITH:  Yes.

27        ATTORNEY CHRISTENSEN:  Can we take a box of

17.

1    Kleenex?  Thank you very much.

2         PRESIDING COMMISSIONER MOORE:  Now how long

3    was she a friend of yours?

4         INMATE SMITH:  Almost as long as Red,

5    probably about six months.  I had known about eight

6    months.

7         PRESIDING COMMISSIONER MOORE:  What else

8    happened prior to this?

9         INMATE SMITH:  What do you mean?

10        PRESIDING COMMISSIONER MOORE:  Was there

11   anything else that happened prior to the -- you

12   going over there and seeing Mr. Darling there with

13   Ms. Miller's cabin?

14        INMATE SMITH:  You mean like a conflict

15   between me and Red or --

16        PRESIDING COMMISSIONER MOORE:  Yeah.

17   Conflict, conflict --

18        INMATE SMITH:  No.  We didn't --

19        PRESIDING COMMISSIONER MOORE:  No?

20        INMATE SMITH:  We were both pursuing the

21   same girl.  And he said that as long as I was

22   dating her, he'd back off.  But for some particular

23   reason that day, he didn't want to.

24        PRESIDING COMMISSIONER MOORE:  Okay.  Okay.

25   So you're both (indiscernible) for Ms. Miller's

26   attention.

27        INMATE SMITH:  Yes.

18.

1    PRESIDING COMMISSIONER MOORE:  And how long

2    had this been going on?

3    INMATE SMITH:  Probably about two months.

4    PRESIDING COMMISSIONER MOORE:  So, let me

5    see.  You knew him about eight months.  How long

6    you say you'd known her?

7    INMATE SMITH:  About six months.

8    PRESIDING COMMISSIONER MOORE:  About six

9    months.  All right.  And then for the last two

10   months prior, you were going out with her.

11   INMATE SMITH:  Well, actually, he dated her

12   first.  And then she split up with him for whatever

13   reason and Annette and I got together.

14   PRESIDING COMMISSIONER MOORE:  And then

15   what?

16   INMATE SMITH:  And then Annette and I got

17   together.

18   PRESIDING COMMISSIONER MOORE:  I see.  I

19   see.  So for the last two months prior to the

20   offense, you and Ms. Miller were going out?

21   INMATE SMITH:  No, not the last two months.

22   PRESIDING COMMISSIONER MOORE:  Well, that's

23   what you just said, about two months after that --

24   I'm sorry.

25   INMATE SMITH:  No.  I was saying, for the

26   last two months that me and Red were both pursuing

27   her during that time -- during those two months.

19

1   He went out with her first and then I started

2   dating her.  I started dating her sometime in June.

3         PRESIDING COMMISSIONER MOORE:  Okay.  So he

4   was dating her first?

5         INMATE SMITH:  Yes.  That's correct.

6         PRESIDING COMMISSIONER MOORE:  Then you was

7   dating her?

8         INMATE SMITH:  Yes.

9         PRESIDING COMMISSIONER MOORE:  So then what

10  happened?  Now this is -- He's supposed to be a

11  friend of yours -- Mr. Darling, right?

12        INMATE SMITH:  Yes.

13        PRESIDING COMMISSIONER MOORE:  Okay.  And so

14  now Mr. Darling is dating her first, then all of a

15  sudden, you want to date her.  What happened there?

16        INMATE SMITH:  Well, she had split up with

17  --

18        PRESIDING COMMISSIONER MOORE:  Okay.  I

19  heard you say that.  But this was your friend,

20  right?

21        INMATE SMITH:  Yes.  And I didn't --

22        PRESIDING COMMISSIONER MOORE:  Okay.  Had he

23  told you it was over?

24        INMATE SMITH:  Yes, he did.

25        PRESIDING COMMISSIONER MOORE:  He said it

26  was done.

27        INMATE SMITH:  Yes.

20

1        PRESIDING COMMISSIONER MOORE:  It was

2  through?

3        INMATE SMITH:  He said that she didn't want

4  to date him.  She didn't want to go out with him.

5        PRESIDING COMMISSIONER MOORE:  That's what

6  he said.

7        INMATE SMITH:  That's what he told me.

8        PRESIDING COMMISSIONER MOORE:  Okay.  And

9  then what did she tell you?

10       INMATE SMITH:  She told me the same thing,

11  that she had split up with him.

12       PRESIDING COMMISSIONER MOORE:  She told you

13  the same thing.  It was over.

14       INMATE SMITH:  Yes.

15       PRESIDING COMMISSIONER MOORE:  Done?

16       INMATE SMITH:  Yes.

17       PRESIDING COMMISSIONER MOORE:  Finished.

18  Washed my hands.

19       INMATE SMITH:  Yes.

20       PRESIDING COMMISSIONER MOORE:  Okay.  But on

21  this day, he wasn't leaving?

22       INMATE SMITH:  No.

23       PRESIDING COMMISSIONER MOORE:  He was going

24  to stay.

25       INMATE SMITH:  That's correct.

26       PRESIDING COMMISSIONER MOORE:  And you

27  weren't going to have that, were you?

21

1        INMATE SMITH:  No.

2        PRESIDING COMMISSIONER MOORE:  The answer is

3    no?

4        INMATE SMITH:  No.  I was afraid that he was

5    going to try and rape her.

6        PRESIDING COMMISSIONER MOORE:  Okay.

7        INMATE SMITH:  I let my fear get the best of

8    me instead of going and calling the police or just

9    asking Annette to leave with me.

10        PRESIDING COMMISSIONER MOORE:  There was no

11    other anger there?

12        INMATE SMITH:  No.

13        PRESIDING COMMISSIONER MOORE:  No other

14    reason?

15        INMATE SMITH:  No.

16        PRESIDING COMMISSIONER MOORE:  It was just

17    all about protection and the defense of Ms. Miller.

18    You sure?

19        INMATE SMITH:  Yes, I'm positive.

20        PRESIDING COMMISSIONER MOORE:  You're

21    positive.  Okay.  So what did you do after that?

22    Let's see, you say you threw your gun against the

23    truck.  Is that what I heard you say?

24        INMATE SMITH:  Yes.  I threw it towards the

25    bed of the truck and then it bounced out and landed

26    on the ground somewhere.

27        PRESIDING COMMISSIONER MOORE:  Then what did

22.

1   you do?

2          INMATE SMITH:  Then I left.  My truck

3   stalled in the intersection.  Annette ran up and

4   said something to me.  Then I went home to my

5   parent's house, got my 30 (indiscernible) and was

6   thinking about killing myself for what I did.

7          PRESIDING COMMISSIONER MOORE:  Well, wait a

8   minute.  Why you going to kill yourself if you were

9   defending Ms. Miller?

10          INMATE SMITH:  Because it don't matter what

11   the reason, I had no right to take his life.

12          PRESIDING COMMISSIONER MOORE:  Well, I agree

13   with you.  But why are you feeling like you had to

14   take your life if you were defending someone else's

15   honor?

16          INMATE SMITH:  Because I still killed him.

17   I mean, it doesn't matter why I killed him.  To me,

18   it's wrong.  I should've never done it.

19          PRESIDING COMMISSIONER MOORE:  Play that

20   back to yourself for a second.  Now, again, you

21   said that you were going to kill yourself because

22   it was wrong, but you were defending someone else's

23   honor -- someone else's life, supposedly.  Right?

24   Ain't that what you just told us?

25          INMATE SMITH:  I told you that I was --

26          PRESIDING COMMISSIONER MOORE:  Defending

27   Ms. Miller's honor.  Didn't you say that?

23

1    INMATE SMITH:  Yes.

2    PRESIDING COMMISSIONER MOORE:  Because you

3    were afraid that she was going to be raped?

4    INMATE SMITH:  Yes, that's correct.

5    PRESIDING COMMISSIONER MOORE:  Right?

6    INMATE SMITH:  That's correct.

7    PRESIDING COMMISSIONER MOORE:  Okay.  But

8    yet, because you defended her, you ran off and were

9    going to shoot yourself.  Explain that to me.

10   INMATE SMITH:  Because I killed Red.  There

11   was no reason to kill him.  I could've done a

12   number of things, which I didn't think about at the

13   time.  But after it happened, then I realized what

14   I had done.  It's wrong.  I shouldn't have shot

15   him.  I could have done a number of things.

16   PRESIDING COMMISSIONER MOORE:  This is true.

17   This is all true in terms of that.  You could've

18   done a number of things.  All right, Mr. Smith.

19   Anything else you want to tell us about your

20   actions of that day, Mr. Smith -- taking the life

21   of Mr. Darling?  Excuse me.

22   INMATE SMITH:  No, Sir.

23   PRESIDING COMMISSIONER MOORE:  All right,

24   then, Mr. Smith, let's look at pre-conviction

25   factors.  Says on July the 28th of 1988, you were

26   placed on six-months informal probation for

27   brandishing a firearm in a rude and threatening

24

1   manner.  Is that accurate?

2       INMATE SMITH:  Yes, that's correct.

3       PRESIDING COMMISSIONER MOORE:  What was that
4   about?

5       INMATE SMITH:  This guy, Kevin McCarty, had
6   jumped me previously in the day and beat me up.
7   And he came back on horseback.  And there was an
8   exchange of words.  My friend had a shotgun in his
9   car and it was broken, unloaded.  And to scare him
10  off, I pulled it out and held it like that.  And he
11  went and called the sheriff.  The sheriff came the
12  next day and interviewed me and told me to see the
13  probation officer a couple of days later.

14      PRESIDING COMMISSIONER MOORE:  Was that the
15  only arrest?

16      INMATE SMITH:  Yes.

17      PRESIDING COMMISSIONER MOORE:  And you have,
18  naturally, the instant offense as an adult.
19  Counsel, I'm going to incorporate the personal
20  factors.

21      ATTORNEY CHRISTENSEN:  All right.  That's
22  fine.

23      PRESIDING COMMISSIONER MOORE:  That
24  information has remained the same and would not
25  have changed.  Let me see, that would be in the
26  March 2002 Board report.

27      ATTORNEY CHRISTENSEN:  Yes.

25

1      PRESIDING COMMISSIONER MOORE:  And let's
2    see, it would be page three, I believe
3    (indiscernible).  Page four, numeral three,
4    subsection (c).  All right.  Mr. Smith, is there
5    anything else you want to tell us about the
6    committing offense at this time?
7          INMATE SMITH:  No, Sir.
8          PRESIDING COMMISSIONER MOORE:  All right,
9    sir.  If you'll give your attention to Commissioner
10   Bachlor, she'll give you a rendition of your post-
11   conviction factors, sir.
12        DEPUTY COMMISSIONER BACHLOR:  Okay.
13   Mr. Smith and Counsel, we're going to cover the
14   period of time from the last hearing which was
15   May 2nd, 2001, until today, and talk about what
16   you've been doing during that past roughly two-year
17   period.  At the time of your last hearing, you were
18   denied parole for one year and asked to remain and
19   become disciplinary-free.  And you were asked to
20   seek self-help and upgrade academically -- looks
21   like educationally.  Does that sound correct?
22        INMATE SMITH:  Yes, that's correct.
23        DEPUTY COMMISSIONER BACHLOR:  All right.
24   Your current classification score, I'm showing, at
25   19, which is the lowest classification score you
26   can attain as a life inmate.  I show that you
27   actually have not had any educational upgrading

26

1   since the time of the last hearing.  Is that

2   correct?

3        INMATE SMITH:  Actually, I have.  There's a

4   certificate in there from Rapid Caption for

5   certification in closed captioning.

6        DEPUTY COMMISSIONER BACHLOR:  Okay.  I don't

7   think I saw that in here.  And you see that as

8   upgrading educationally?  I see it as attaining

9   additional skills, it sounds like, in your job.

10       INMATE SMITH:  Yeah.

11       DEPUTY COMMISSIONER BACHLOR:  Is that

12   correct?

13       INMATE SMITH:  Yeah, that's correct.

14       DEPUTY COMMISSIONER BACHLOR:  Okay.

15       INMATE SMITH:  As far as educationally,

16   there is really not much in the way of -- In fact,

17   there's nothing in the way of that available to me

18   because I'm a high school graduate.

19       DEPUTY COMMISSIONER BACHLOR:  Okay.  All

20   right.  You graduated before you came to prison.

21   Is that correct?

22       INMATE SMITH:  Yes.

23       DEPUTY COMMISSIONER BACHLOR:  Okay.  And I

24   do show that you were -- You continue to be

25   employed as the brail transcriber.  Is that

26   correct?

27       INMATE SMITH:  Yes, that's correct.

27

1       DEPUTY COMMISSIONER BACHLOR:  Or a brail

2  transcriber getting exceptional ratings.  And

3  you've been in that position since March of '95.

4       INMATE SMITH:  Yes, that's correct.

5       DEPUTY COMMISSIONER BACHLOR:  All right.  As

6  far as self-help programs, you continue to

7  participate in NA, it appears.

8       INMATE SMITH:  Yes.

9       DEPUTY COMMISSIONER BACHLOR:  And

10  disciplinary conduct, you still have the one 115

11  for positive urinalysis.  And that was from March

12  of '97.  Nothing since that time?

13       INMATE SMITH:  Nothing since then.

14       DEPUTY COMMISSIONER BACHLOR:  I'm showing

15  only one 128 in the file also for possession of

16  contraband.  What kind of contraband was that?

17       INMATE SMITH:  I had taken some cigarettes

18  snuck into the hospital area.

19       DEPUTY COMMISSIONER BACHLOR:  Okay.  And

20  that was back in '96 -- January of '96.

21       INMATE SMITH:  Yes.

22       DEPUTY COMMISSIONER BACHLOR:  Nothing since

23  that time.  So that's actually a very positive

24  disciplinary history.  The urinalysis was not, in

25  this last period but because you were denied parole

26  only one year, this year, I mean -- Because you

27  were only denied parole for one year, it kind of

1  starts to look like you might become a suitable

2  candidate for parole.  So I think it's important

3  that maybe we just talk about the urinalysis

4  -- positive urinalysis back in '97.  It apparently

5  was behind some stressful situation for you.  Is

6  that correct?

7       INMATE SMITH:  Yes, that's correct.  My

8  father had died and then my brother died.  And

9  because of that, my mom was having a very hard

10 time.  She was wondering why I hadn't been released

11 to come home and help her.  So I felt pretty

12 stressed out.

13      DEPUTY COMMISSIONER BACHLOR:  Okay.

14      INMATE SMITH:  You know, not being able to

15 do anything for her.

16      DEPUTY COMMISSIONER BACHLOR:  All right.

17 Have you taken some stress management classes in

18 the past?

19      INMATE SMITH:  Yes, I have.

20      DEPUTY COMMISSIONER BACHLOR:  Okay.  Have

21 they taught you some other means of coping with --

22      INMATE SMITH:  Yes.

23      DEPUTY COMMISSIONER BACHLOR:  -- stressful

24 situations.  What kinds of things?

25      INMATE SMITH:  Well, there's meditation

26 -- and actually going out and walking helps and

27 just talking to people.

29

1      DEPUTY COMMISSIONER BACHLOR:  Did you do

2    those things during that time period?

3      INMATE SMITH:  During that time period, no.

4    That was my downfall.

5      DEPUTY COMMISSIONER BACHLOR:  And it was

6    heroin, I believe.  Is that correct?

7      INMATE SMITH:  Yes, yes.  First time I had

8    ever used it and the last time I'll ever use it.

9      DEPUTY COMMISSIONER BACHLOR:  Okay.  Your

10   drug of choice was meth.  Is that correct?

11     INMATE SMITH:  Yes, that's correct.

12     DEPUTY COMMISSIONER BACHLOR:  And when

13   you're using methamphetamine on the street, was

14   that also an escape from stressful situations?

15     INMATE SMITH:  No.  See, my whole problem

16   was, when I was out there on the streets, I was

17   very shy.  So I was using alcohol as a way of

18   opening up.  And methamphetamine, I was using as a

19   way of basically just staying awake longer.

20     DEPUTY COMMISSIONER BACHLOR:  Why, staying

21   awake longer?

22     INMATE SMITH:  To socialize more.

23     DEPUTY COMMISSIONER BACHLOR:  All right.  Is

24   there anything else that you've been doing.  I saw

25   nothing else as far as self-help in the last two

26   years.

27     INMATE SMITH:  No.

30

1          DEPUTY COMMISSIONER BACHLOR:  Is that

2    accurate?

3          INMATE SMITH:  No, just that night.

4          DEPUTY COMMISSIONER BACHLOR:  Okay.  And as

5    far as NA goes, how do you find that working for

6    you today?

7          INMATE SMITH:  It's working very well.

8          DEPUTY COMMISSIONER BACHLOR:  Okay.  Well,

9    what do you find that's helpful?

10          INMATE SMITH:  Being able to talk about my

11    experiences with other people and other people's

12    similar experiences and how to stay drug-free and

13    alcohol-free.

14          DEPUTY COMMISSIONER BACHLOR:  All right.

15          INMATE SMITH:  And not fall back in those

16    same traps.

17          DEPUTY COMMISSIONER BACHLOR:  As far as the

18    12-steps go, which of the steps have you found the

19    most useful?

20          INMATE SMITH:  Step 10, continuing

21    (indiscernible) personal inventory and

22    (indiscernible).

23          DEPUTY COMMISSIONER BACHLOR:  All right.  As

24    far as Red goes, did Red have family members in the

25    area?

26          INMATE SMITH:  No.  Red was from Boston.  He

27    was out here from when he joined the Marines.  And

31

1    when he left the Marines, he had moved up to the

2    mountain area.

3         DEPUTY COMMISSIONER BACHLOR:  So as far as

4    making amends to the family --

5         INMATE SMITH:  No, I haven't.  At this time,

6    if I wrote them a letter or something, it would be

7    opening up an old wound.  And I wouldn't want to

8    cause them anymore pain that I already have.

9         DEPUTY COMMISSIONER BACHLOR:  All right.

10   When did you first start in the AA or NA program?

11        INMATE SMITH:  NA, it's been quite a while.

12   I can't remember exactly what --

13        DEPUTY COMMISSIONER BACHLOR:  When do you

14   think --

15        INMATE SMITH:  -- it's been.

16        DEPUTY COMMISSIONER BACHLOR:  -- you first

17   grasped the 12 steps?

18        INMATE SMITH:  I'd say about five years or

19   so.

20        DEPUTY COMMISSIONER BACHLOR:  Five years

21   ago.

22        INMATE SMITH:  When I really took into

23   account everything of what they meant and how you

24   actually work each individual step and progress

25   from there.

26        DEPUTY COMMISSIONER BACHLOR:  All right.

27   You'd been in there for a long time prior to that.

32

1      INMATE SMITH:  Yes.

2      DEPUTY COMMISSIONER BACHLOR:  So what was so

3  important about five years ago?

4      INMATE SMITH:  Well, actually, I think my

5  relapse was what did that -- what caused me to

6  really look at it hard.

7      DEPUTY COMMISSIONER BACHLOR:  Okay.  All

8  right.  Have you had a chance to look at your Board

9  report?

10      INMATE SMITH:  Yes, I have.

11      DEPUTY COMMISSIONER BACHLOR:  Do have any

12  comments you want to make about the Board report?

13  I know you had the rebuttal here --

14      INMATE SMITH:  Yes.

15      DEPUTY COMMISSIONER BACHLOR:  -- regarding

16  it.  And I'm sure that that's partially -- let me

17  get into the record the Board report dated March

18  2002 is the last one we have in the file.  That was

19  not updated for this hearing.  You've had several

20  postponements which have caused you to go almost

21  two years or actually more than two years now since

22  your last hearing with only a one-year denial.  But

23  it is written by Correctional Counselor Macias-

24  Graham, that's M-A-C-I-A-S- hyphen G-R-A-H-A-M.

25  And on the last page of this, and I can understand

26  your concern, in summary, she has indicated -- I

27  believe it's a she?

33

1        INMATE SMITH:  Yes.

2        DEPUTY COMMISSIONER BACHLOR:  Is that

3   correct?  Is indicating:

4            "Concerning the commitment offense,

5            prior juvenile record and prison

6            adjustment, this writer believes the

7            prisoner would pose an unpredictable

8            degree of threat to the public if

9            released at this time.  The

10           assessment is based on the fact the

11           prisoner does not seem to cope well

12           under stress."

13   And she bases that, again, on what we were just

14   asking about, I think, on the positive urinalysis.

15   And also indicates your psychosocial assessment,

16   March 23rd of 2000, addresses the reason for the

17   positive urinalysis being the passing of your

18   brother and your father within a 10-day period.

19   And I don't think anyone would indicate that that

20   wouldn't be stressful for someone.  Our only

21   concern would be your choice of how you deal with

22   the stress.

23        INMATE SMITH:  Yes.

24        DEPUTY COMMISSIONER BACHLOR:  And as you've

25   indicated, and I think wisely, the relapse caused

26   you to take a different look maybe --

27        INMATE SMITH:  Yes.

34

1      DEPUTY COMMISSIONER BACHLOR:  -- at NA.  So

2   you believe that's assisted you as far as your

3   potential for future staying away --

4      INMATE SMITH:  Immensely.

5      DEPUTY COMMISSIONER BACHLOR:  -- from

6   narcotics.

7      INMATE SMITH:  Immensely.

8      DEPUTY COMMISSIONER BACHLOR:  You don't --

9   Would you think the percentage of chance would be

10  that you'd turn to drugs again?

11     INMATE SMITH:  I'd say no.

12     DEPUTY COMMISSIONER BACHLOR:  What would be

13  your percentage of chance that you would turn to

14  suicide?

15     INMATE SMITH:  No.

16     DEPUTY COMMISSIONER BACHLOR:  All right.

17  And that's all based on what?

18     INMATE SMITH:  Based upon my understanding

19  myself better.  Understand that, you know, things

20  just don't go our way.

21     DEPUTY COMMISSIONER BACHLOR:  And the reason

22  I bring that up again, too, is she brings out the

23  fact that you were attempting or contemplating

24  suicide at the time of the offense or right after

25  the offense.  And that you also, I believe, had

26  some prior suicide attempts.  Is that correct, as a

27  child?

35

1          INMATE SMITH:  No.

2          DEPUTY COMMISSIONER BACHLOR:  All right.

3    This was your only time?

4          INMATE SMITH:  Yes.  Yeah.  At that time

5    when I was in the county jail and at the time of

6    the instant offense.

7          DEPUTY COMMISSIONER BACHLOR:  Okay.  So it

8    was while you were in the county jail?

9          INMATE SMITH:  Yes.

10         DEPUTY COMMISSIONER BACHLOR:  All right.

11   And the reason for thinking about suicide at that

12   time was what?

13         INMATE SMITH:  Was for what I had done.

14         DEPUTY COMMISSIONER BACHLOR:  Okay.  Still

15   the same thing.  All right.  Okay.  Is there

16   anything -- any comments you want to make about

17   this -- how long -- Let me ask you this.  How long

18   had Macias-Graham been your counselor?

19         INMATE SMITH:  I think for about a year.

20         DEPUTY COMMISSIONER BACHLOR:  All right.

21   Had you had several encounters with her during that

22   time?

23         INMATE SMITH:  No.

24         DEPUTY COMMISSIONER BACHLOR:  So it was just

25   the writing of the report?

26         INMATE SMITH:  Pretty much, yes.

27         DEPUTY COMMISSIONER BACHLOR:  How long did

36

1    you sit and talk with her?

2         INMATE SMITH:  About 20 minutes, I'd say --

3    20 to 25 minutes.

4         DEPUTY COMMISSIONER BACHLOR:  All right.

5    Anything else you want to put on the record

6    regarding your Board report?

7         INMATE SMITH:  Just I'd like to have my

8    rebuttal fully read.  That's all.

9         DEPUTY COMMISSIONER BACHLOR:  Well, your

10   rebuttal kind of goes a lot into the factors of the

11   crime wherein, I believe, you indicated you --

12   there were only 16 casings instead of 14.  And, I

13   think, maybe the DA's office will get into some of

14   this.  I don't know.  But I would ask you -- And

15   it's the fact that you only shot the person in the

16   head four times rather than five or six.  I'd ask

17   you what you feel the important of those

18   clarifications might be?

19        INMATE SMITH:  Well, really what I want to

20   do is clear up the probation officer's report which

21   is incomplete.

22        DEPUTY COMMISSIONER BACHLOR:  All right.

23   What part of that?

24        INMATE SMITH:  He leaves out a lot of stuff.

25   He even stated in his report that he wasn't going

26   to do a full report because the crime only carried

27   one sentence.

37

1   DEPUTY COMMISSIONER BACHLOR:  What kinds of

2   important factors are you wanting us to know about

3   that you believe are left out of that report?

4   INMATE SMITH:  Well, basically, my version

5   of what happened.  His version that he puts in the

6   probation officer's report is very minimal.

7   DEPUTY COMMISSIONER BACHLOR:  But you

8   couldn't remember what happened.

9   INMATE SMITH:  Well, I couldn't remember

10  actually doing it.  But like the -- everything that

11  led up to it.

12  DEPUTY COMMISSIONER BACHLOR:  Okay.  Such as

13  -- You mean, in other words, the fact that you

14  weren't -- It wasn't a jealous rage.  Instead it

15  was a protecting --

16  INMATE SMITH:  Yes, exactly.

17  DEPUTY COMMISSIONER BACHLOR:  -- of Annette?

18  Is that the main factor?

19  INMATE SMITH:  Yes.

20  DEPUTY COMMISSIONER BACHLOR:  All right.  I

21  think there's some indication in the probation

22  officer's report that possibly she was afraid of

23  you and that's why she went out of the bathroom

24  window?

25  INMATE SMITH:  Yes.  And that's incorrect.

26  That's something she had wrong in her report.

27  DEPUTY COMMISSIONER BACHLOR:  She just

38

1    didn't want to go around the body?

2          INMATE SMITH:  She didn't want to go around

3    -- right.

4          DEPUTY COMMISSIONER BACHLOR:  All right.

5    And are those the two main points?

6          INMATE SMITH:  And the fact that her

7    assessment at the end doesn't -- I mean, all my

8    psych reports all say completely the opposite of

9    what she says.

10          DEPUTY COMMISSIONER BACHLOR:  Okay.  All

11    right.  Do you want to go to your psych reports for

12    a minute --

13          INMATE SMITH:  Yes, please.

14          DEPUTY COMMISSIONER BACHLOR:   -- and get

15    those on the record.  The last one we have in the

16    file actually is one dated March 23rd, 2000.  And

17    then we have an update that it was February 5th,

18    2000.  The update is by Melvin Macomber, M-A-C-O-M-

19    B-E-R.  And in that, the doctor, who's a clinical

20    psychologist, indicates the prior evaluation by

21    Glover, G-L-O-V-E-R, is still current and valid.

22    And that is the one that I mentioned that's in here

23    from March 23rd, 2000.  Glover noted, apparently,

24    that your violence potential in comparison to other

25    inmates was below average.  And Macomber is saying

26    he agrees and believes the violence potential is

27    extremely small in this case.

39

1    "The commitment offense was very

2    situational and not at all likely to

3    reoccur.  And Mr. Smith makes a very

4    positive presentation.  He has

5    sincere feelings of remorse.  He has

6    been programming in an outstanding

7    manner.  And in summary, he says

8    there are no psychological factors in

9    this case that would interfere with

10   release planning.  He is an excellent

11   candidate for parole.  Prognosis for

12   successful adjustment in the

13   community is excellent."

14   Is that kind of what you're referring to?

15   INMATE SMITH:  Yes.

16   DEPUTY COMMISSIONER BACHLOR:  All right.  As

17   far as a diagnosis, in the March 2000 report, they

18   only talk about the alcohol and methamphetamine

19   abuse.  No other mental health problems.  All

20   right.  Is there anything else we need to know or

21   anything else you want us to look at regarding the

22   psychological report?

23   INMATE SMITH:  Not that I can think of right

24   now.

25   DEPUTY COMMISSIONER BACHLOR:  All right.

26   Let's go to your parole plans then.

27   INMATE SMITH:  Okay.

40.

1    **DEPUTY COMMISSIONER BACHLOR:** All right.

2    And according to parole plans, some of these later

3    -- letters are outdated, but still appropriate

4    considering they were for your last hearing.

5    That's a good time for that.

6        [Thereupon, the tape was turned over]

7    **DEPUTY COMMISSIONER BACHLOR:** All right. We

8    should be back on record. Side two in the hearing

9    of Mr. Smith. And that is C number 99842. And

10   we're just going to parole plans. My understanding

11   is that you would want to live with your mother,

12   Dagmar Smith.

13   **INMATE SMITH:** Yes, that's correct.

14   **DEPUTY COMMISSIONER BACHLOR:** In Lock Loman

15   (phonetic).

16   **INMATE SMITH:** Yeah, Lock Loman.

17   **DEPUTY COMMISSIONER BACHLOR:** Okay. And

18   what county is that?

19   **INMATE SMITH:** Lake County.

20   **DEPUTY COMMISSIONER BACHLOR:** All right.

21   Which is the commitment offense county. And that

22   you -- You have some letters in the file even that

23   indicate you might have a real good chance of

24   continuing with your work as a brail transcriber.

25   Is that correct?

26   **INMATE SMITH:** Yes, that's correct, with the

27   California Department of Education.

41

1    DEPUTY COMMISSIONER BACHLOR: All right. In

2    fact, there's some letters that we do have in the

3    file. We do have a letter in the file here and the

4    one we're talking about now is one from Rod J.

5    Brawley. It's B-R-A-W-L-E-Y, Director, and that's

6    with the California Department of Education who

7    mentions that your skills -- there's a shortage of

8    qualified transcribers in the United States and

9    opportunities for employment abound in his opinion.

10    And that it's basically a job that pays eighteen

11    dollars per hour, which is decent.

12    INMATE SMITH: Yes, that's an average.

13    DEPUTY COMMISSIONER BACHLOR: Okay. For

14    someone with your skills. And he does laud you

15    basically saying that brail was very difficult and

16    when describing your brail skills, his worker, I

17    guess, Ann Kelt, the formatter, used words like

18    excellent and superb. And she doesn't give

19    compliments easily. So you were commended for that

20    (indiscernible) how proficient you are. We have a

21    letter in here from a Marvin Speed who is the

22    Executive Officer of the Board of Prison Terms,

23    dated March 20th, 2002. It's written to Bob

24    Schmitz who is the program director at Folsom for

25    the blind project -- Visually Impaired project

26    here. And it's expressing sincere appreciation for

27    the outstanding job of translating the Board of

42.

1    Prison Terms' forms into brail.  And apparently you

2    had some part in that.

3              INMATE SMITH:  Yes.

4              DEPUTY COMMISSIONER BACHLOR:  Is that

5    correct?

6              INMATE SMITH:  Yes.  I did quite a few of

7    those.

8              DEPUTY COMMISSIONER BACHLOR:  All right.

9    You have a letter in the file, March 19th, 2002,

10   from a Robert Schmitz, Correctional Officer, Folsom

11   State Prison.  And that one says:

12              "My name is Bob Schmitz.  For the

13              past 11 years, I've been a

14              correctional officer at Folsom State

15              Prison.  On August 11th, 1997, he was

16              assigned to the program supervisor,

17              Folsom project, Visually Impaired.

18              Had 20 inmates working full-time for

19              the project and you were one of them.

20              Says you have been here for

21              approximately 84 months, committed

22              himself -- yourself to the program.

23              Looking for something more meaningful

24              to do with your life.  And in the

25              time that he supervised you, you

26              excelled far beyond the average

27              inmates within the institutional

43

1          setting.  Says you are an exemplary

2          employee and works well with staff

3          and others and courteous and helpful.

4          He's seen much growth in you."

5      I have a letter from Dagmar Smith, your mother,

6      April 18th, 2002.  And talks about the fact that

7      you have the skills we just talked about.  And you

8      also have prior skills as a journeyman carpenter

9      prior to coming into prison.

10          INMATE SMITH:  Yes, that's correct.

11          DEPUTY COMMISSIONER BACHLOR:  And should you

12     be paroled, you have the constant support of your

13     sister and her.  And that doesn't specifically say

14     that's for housing.  Is that correct?

15          INMATE SMITH:  What's the date on that

16     letter that you have?

17          DEPUTY COMMISSIONER BACHLOR:  That was

18     April 18th, 2002.  We don't have a more recent

19     letter in the file.

20          INMATE SMITH:  So it's not, yeah.  Maybe

21     it's in my sister's letter.

22          DEPUTY COMMISSIONER BACHLOR:  There's one

23     April 18th, 2002, from Janet Smith, your sister.

24     And in that, she does refer to the fact, I believe,

25     your mother just suffered some medical

26     difficulties.  And it indicates her house is

27     currently vacant and --

44

1    INMATE SMITH:  Yeah.

2    DEPUTY COMMISSIONER BACHLOR:  -- you would

3    be living there and helping your mother with the

4    general maintenance and upkeep of the home.

5    INMATE SMITH:  That's correct.

6    DEPUTY COMMISSIONER BACHLOR:  Is that what

7    you want to do?

8    INMATE SMITH:  Yes, it is.

9    DEPUTY COMMISSIONER BACHLOR:  Okay.  There's

10   also something in the file here that shows some

11   different programs that are available in Narcotics

12   Anonymous.  And I'm taking that one of these is in

13   the Lake County area close to the place where you

14   want to reside?

15   INMATE SMITH:  Yeah.  All of them are from

16   the Lake County area, I'm pretty sure.  I had

17   written them and asked them so I'd know what groups

18   were available and where.

19   DEPUTY COMMISSIONER BACHLOR:  All right.

20   You plan to --

21   INMATE SMITH:  They're all in Lake County.

22   DEPUTY COMMISSIONER BACHLOR:  -- plan to

23   continue with Narcotics Anonymous on the street?

24   INMATE SMITH:  Yes, I do.

25   DEPUTY COMMISSIONER BACHLOR:  All right.  I

26   also have a document here showing the number of

27   books that you have read, apparently.  And Seven

1   Habits of Highly Effective People.  I'm not going

2   to go through all of them, but apparently a lot of

3   self-help type books.  Is that correct?

4           INMATE SMITH:  Yes.  A lot of textbooks.

5           DEPUTY COMMISSIONER BACHLOR:  Okay.  The

6   last one I'm going to read is fairly old.  And I'm

7   not going to go any further back than this because

8   it should've been at the last hearing.

9   August 26th, 2001, it's from a Judith James and a

10  Lindy Williams, Scott Hamilton and Peggy Tate.

11  They're all employers -- are employees of the

12  California Community Colleges.  And, there again,

13  just talking about the highly specialized and

14  sought-after skills that you possess as a brail

15  transcriber and the fact that there are media

16  positions in each of the hundred and eight

17  California community colleges throughout the state.

18  I think they're trying to indicate you would have

19  no trouble finding a job.

20          INMATE SMITH:  Yes, that's correct.

21          DEPUTY COMMISSIONER BACHLOR:  Does that

22  cover the letters as far as support?

23          INMATE SMITH:  Yes.

24          DEPUTY COMMISSIONER BACHLOR:  All right.  We

25  sent out 3042 Notices to the various entities, the

26  District Attorney's office, sheriff's department,

27  judges.  We did receive a letter from the Lake

46

1    County District Attorney's office. And of course,

2    we have a representative here that will be speaking

3    at the appropriate time. And he can address any

4    concerns that they have. We got a letter also from

5    the sheriff department. And that one is dated

6    April 16th, 2002. And that is from

7    Rodney K. Mitchell, M-I-T-C-H-E-L-L, who was the

8    Sheriff Coroner for Lake County. It's a very brief

9    letter and just says that the sheriff's department

10   stands in opposition to the possible parole of

11   Vincent Scott Smith. And indicates on July 7th of

12   '84, you saw fit to take a human life because of a

13   jealous impulse. Such a callous disregard for

14   human life cannot be tolerated or excused, even

15   after 17 years of incarceration. We had no other

16   responses to the 3042 Notices. And with that, I'll

17   turn it back to the Chair.

18           PRESIDING COMMISSIONER MOORE:  Questions?

19           DEPUTY COMMISSIONER BACHLOR:  I did have a

20   question. I'm not familiar with Lake County, and

21   I'm thinking it's kind of a small county. Why did

22   you have a rifle in the first place?

23           INMATE SMITH:  My rifle was in my truck from

24   when I was out target shooting the day before.

25           DEPUTY COMMISSIONER BACHLOR:  Target

26   shooting with a -- This is a semi-automatic rifle?

27           INMATE SMITH:  No, 22-rifle.

47.

1    (indiscernible) with guns, stuff like that.

2         DEPUTY COMMISSIONER BACHLOR:  And so all you

3    did with that rifle is target shoot?

4         INMATE SMITH:  Target shoot and shot

5    rabbits, stuff like that.

6         DEPUTY COMMISSIONER BACHLOR:  And the reason

7    -- Who did you go target shooting with the day

8    before?

9         INMATE SMITH:  I went by myself.

10        DEPUTY COMMISSIONER BACHLOR:  How often did

11   you go target shooting?

12        INMATE SMITH:  Quite often, actually.

13        DEPUTY COMMISSIONER BACHLOR:  You're a

14   pretty good marksmen?

15        INMATE SMITH:  Fairly decent.

16        DEPUTY COMMISSIONER BACHLOR:  Okay.  So it

17   was in your truck --

18        INMATE SMITH:  Yes.

19        DEPUTY COMMISSIONER BACHLOR:  -- because of

20   target shooting.  And you carried it around with

21   you on a pretty regular basis?

22        INMATE SMITH:  Yes.

23        DEPUTY COMMISSIONER BACHLOR:  Okay.

24        INMATE SMITH:  Either that or one of my

25   other -- shotgun.  Something like that.

26        DEPUTY COMMISSIONER BACHLOR:  Prior to the

27   day of the commitment offense, had Red -- as you

48

1   call him your friend, had he started to make

2   comments like he was becoming interested in being

3   with Annette again?

4           INMATE SMITH:  No.

5           DEPUTY COMMISSIONER BACHLOR:  So you thought

6   everything was still --

7           INMATE SMITH:  I thought --

8           DEPUTY COMMISSIONER BACHLOR:  -- finished?

9           INMATE SMITH:  -- everything was still --

10  yeah.  Still over between them two.

11          DEPUTY COMMISSIONER BACHLOR:  Okay.  I have

12  no further questions.

13          PRESIDING COMMISSIONER MOORE:  Mr. Hopkins,

14  questions.

15          DEPUTY DISTRICT ATTORNEY HOPKINS:  I think

16  that the Commissioner has asked the questions that

17  came to my mind.  As I listened, I don't remember

18  any being left.

19          PRESIDING COMMISSIONER MOORE:  All right.

20  Thank you, sir.  Questions, Ms. --

21          ATTORNEY CHRISTENSEN:  I have a couple.  Did

22  you turn yourself in?

23          INMATE SMITH:  Yes, I did.

24          ATTORNEY CHRISTENSEN:  Did you have a trial?

25          INMATE SMITH:  No, I pled guilty.

26          ATTORNEY CHRISTENSEN:  You pled.  Okay.  How

27  do you feel about guns today?

49.

1        INMATE SMITH:  Well, I don't have any
2   problem with guns.  Guns don't -- It's the person
3   that uses the gun.

4        ATTORNEY CHRISTENSEN:  Okay.  In what ways
5   do you feel that your judgment has improved since
6   your years of incarceration?

7        INMATE SMITH:  Well, now instead of when I'm
8   afraid or something like that -- Instead of leaping
9   to a conclusion, I'll take time and step back and
10  think about what I'm going to do.

11       ATTORNEY CHRISTENSEN:  Do you feel that you
12  present any degree of threat to the public in
13  Lake County or anywhere else --

14       INMATE SMITH:  No.

15       ATTORNEY CHRISTENSEN:  -- for that matter?
16       INMATE SMITH:  No.

17       ATTORNEY CHRISTENSEN:  And why is that?

18       INMATE SMITH:  Because I'm not a violent
19  person.  I'm not a danger to anybody.  I wouldn't
20  want to harm anybody.

21       ATTORNEY CHRISTENSEN:  And do you feel that
22  you still have a problem with drugs and alcohol?

23       INMATE SMITH:  No.

24       ATTORNEY CHRISTENSEN:  Well, when you say
25  no, do you mean that you do not intend to be in a
26  substance abuse program?

27       INMATE SMITH:  No.  I'll still continue with

50

1    NA, but I have no desire to drink anymore, no

2    desire to use crank anymore.

3         ATTORNEY CHRISTENSEN:  What if you were --

4         INMATE SMITH:  I don't -- The reasons that I

5    was using those was -- like I said, was because I

6    felt that I needed them so I could be more sociable

7    and talk to people easier.  I don't need that

8    anymore.  My shyness is gone.

9         ATTORNEY CHRISTENSEN:  Well, what about when

10   you're on the outside and you're in a different

11   environment dealing with people in a more normal

12   way?

13        INMATE SMITH:  What, you mean, drinking

14   socially.  No.

15        ATTORNEY CHRISTENSEN:  Drinking socially.

16        INMATE SMITH:  No, that's -- I never -- I

17   never really liked the taste of alcohol anyway.  So

18   to sit there and sip wine, no.  I'd just as soon

19   drink water.

20        ATTORNEY CHRISTENSEN:  Okay.  What if

21   someone were to offer you drugs?

22        INMATE SMITH:  No.  I wouldn't take it.

23   I've been offered it here and I won't take it.

24        ATTORNEY CHRISTENSEN:  All right.  I have no

25   further questions.

26        PRESIDING COMMISSIONER MOORE:  Closing,

27   Mr. Hopkins.

51

1   DEPUTY DISTRICT ATTORNEY HOPKINS:   Thank

2   you, Commissioners.  You know, it -- I think that

3   Mr. Smith has a lot to offer that many inmates

4   facing these charges and doing life do not.  But

5   the thing that concerns me the most is the fact

6   that he says he takes full responsibility for his

7   actions and then tries to minimize and justify in a

8   way that's not supported by the evidence.  And the

9   reason it gives me concern is because I'm afraid

10   that what he's doing is justifying to himself why

11   he did what he did which may cause us problems if

12   he's released and he runs into stressors or he runs

13   into problems.  And he's got the kind of approach

14   that he can basically justify what he's done.  Now

15   I think there is an unusual characteristic in

16   people who can take a human life, especially in a

17   situation that is so trivial.  So one of the things

18   I look for is what's going on inside the person

19   that maybe brought them to that and what has that

20   person learned about themselves to convince us that

21   they won't be a danger to my community if he's

22   released.  And he has some good answers to all the

23   narcotics and alcohol and other kinds of issues

24   that are raised.  But this part about protecting

25   Annette Miller from rape did not come out before.

26   He says that he said something to Red about taking

27   him home and leaving.  And Red said, no, I'm going

1   to stay here until I get something.  That, until I
2   get something, is never mentioned before lifer
3   hearings.  It's not mentioned to the three doctors
4   that examined him and asked him for his accounting
5   of the incident when he entered a not guilty by
6   reason of insanity plea and they talked to him
7   about what went on.  Of course, this conversation
8   was supposed to have occurred outside the presence
9   of Ms. Miller so she did not mention anything and
10  probably wouldn't have been expected to.  And then
11  her brother, the inmate's best friend, when he
12  testifies, he asked the inmate why he did it, and
13  Mr. Smith's reply was, he shouldn't have messed
14  with Annette.  And actually, his actual language
15  when asked at the preliminary hearing was he
16  shouldn't have fucked with Annette.  That was his
17  explanation to David Eaton, Annette's brother,
18  Mr. Smith's best friend.  He didn't tell anybody at
19  that time that Mr. -- that Red said, I'm going to
20  stay until I get some.  When he gives his
21  explanations to the -- I've got it in a couple
22  places here -- the doctors that examined him with
23  respect to the insanity plea, he tells them that
24  Red said, no, I'm staying right here, not I'm
25  staying right here until I get something.
26  Dr. Anderson, in his report, says, when I asked
27  him, Mr. Smith, how do you account for what

53

1    happened.  His reply was, quote, "I was jealous and
2    angry and using drugs and alcohol," close quotes.
3    And that about sums it up.  Annette describes, in
4    her written statement -- It was a typed statement
5    given to the sheriff's department.  It's included
6    in the materials that Mr. Smith submitted to the
7    Board because he was taking issue with the fact
8    that she was not -- whether she was afraid of him
9    and that's why she went out the window.  But she
10   goes through this whole scenario.  And what she
11   sets up is that Red is teasing Mr. Smith because
12   Mr. Smith wants to go out with Annette.  And
13   Annette's saying no.  I don't want to have a
14   serious relationship.  He explained to one of the
15   doctors, and it was in one of those reports, that
16   she was going through a divorce.

17          "And she kept telling him, I don't
18          want to have a serious relationship.
19          I don't want to have a serious
20          relationship with you.  So he says
21          that he and Red were having this
22          agreement, that Red was backing off
23          because Mr. Smith was interested.
24          And actually Red had dated her before
25          and it wasn't working out.  So he's
26          being teased over this occasion.  And
27          she's saying that Red knows Vinnie

54

1    likes me and likes to tease Vinnie

2    about it.  And he throws a pillow at

3    her and he's doing stuff like that,

4    and Vinnie's getting mad.  She went

5    out onto the front porch because she

6    was looking for her dog.  And Vinnie

7    walked out to his truck and opened

8    the door.  I couldn't see what he was

9    doing, she says.  I asked him what

10   was wrong.  And he said, nothing.  I

11   said, yeah, there is.  He just

12   smiled.  I think I asked if Red was

13   making him mad and he said, I don't

14   want to talk about it.  I leaned

15   against the porch rail and asked

16   Vinnie if he was going to give Red a

17   ride.  And she says, Red needed to go

18   somewhere.  Vinnie asked me if I

19   wanted Red to leave.  And I said, I

20   think you better ask him to go.

21   Red's joking was getting a little out

22   of hand.  I looked at Vinnie and I

23   told him not to let Red's joking

24   bother him.  Vinnie didn't say

25   anything.  At that point is when he

26   went, got his gun and came in and

27   shot Red."

55

1   She's painting this picture of -- and through the
2   rest of the description of what was going on, he
3   was coming and going.  He drives all the way done
4   to (indiscernible).  And that's quite a long drive
5   from (indiscernible) Mountain.  And he comes back
6   and he goes over to some other people's houses.  He
7   goes four-wheeling.  There's all this stuff going
8   on.  He keeps coming back and Red is still there.
9   So his anger and jealously are building.  He's
10  getting madder and madder.  And what he doesn't do
11  is he doesn't accept and appreciate it that now.
12  He tries to minimize it.  He goes in at the time of
13  the trial being set and enters a not guilty by
14  reason on insanity plea.  After he enters his plea
15  to a second degree murder with the use of a
16  firearm, he takes a writ and claims his public
17  defender promised him he'd only do eight and half
18  years.  And all the transcripts are clear that
19  everyone talked about 15 to life.  He's got an
20  experienced public defender that would never get
21  that wrong.  And then he starts saying Annette was
22  going to be raped.  And then he says, Red told me
23  I'm not going to leave until I get some.  And none
24  of this is borne out by any of the evidence at the
25  time and the things that he told the doctors.  So
26  my concern is that he is finding a way to minimize
27  it.  This was a very callous and cruel offense --

56

1   totally trivial, totally senseless, carried out in

2   a manner that exhibited a callous disregard for the

3   life or suffering of another simply because he got

4   jealous. Yes, alcohol and drugs can affect a

5   person's judgment. But how many people have their

6   judgment affected to the point where they go and

7   kill a good friend just because he's making him mad

8   and jealous. And maybe Red was doing it on

9   purpose, just picking on him. But to shoot him,

10  what looks like may have been 14 times because I

11  went through the file that I have and I see that

12  the preliminary hearing exhibit list includes 14

13  casings. The DOJ report refers to 14 casings that

14  were submitted. All casings are not always

15  submitted. But it appears in this case that

16  could've been the situation. But 14 or 16, it

17  really doesn't matter. The victim was very

18  vulnerable because he was an unsuspecting friend.

19  He had defensive wounds on his body that indicated

20  that he was holding his arms, hands up trying to

21  prevent his execution. There's absolutely no

22  justification to the provocation for this. The

23  doctor -- recommendation from Dr. Glover, he says

24  right there -- I believe Mr. Smith's rendition that

25  he was trying to prevent this woman from being

26  raped. So without looking at the evidence in the

27  case, it says it's completely out of agreement with

1   the evidence.  He just adopts Mr. Smith's version
2   of what he tells him.  And for that reason, I think
3   that his conclusion is faulty.  In terms of his
4   prediction of Mr. Smith's dangerousness, I think
5   that the correctional counselor who said it's an
6   unpredictable danger is the accurate person in this
7   regard.  And we don't know what would happen
8   because Mr. Smith has not come to grips with his
9   responsibility and really accepted it.  And we
10  don't know what he would do if he got out there.
11  And it looks like he might have a good shot at
12  getting a job translating brail.  It pays well.
13  It's a good responsible contribution to society.
14  It would make him, I think, feel pretty good about
15  himself.  What happens when the budget crashes as
16  it is now and they decide they can't hire people to
17  do that and they let him go.  And he's got no
18  occupation.  And he tries to get a job as a
19  carpenter and it doesn't work.  What does he do
20  then.  We don't know.  I think the big telling
21  thing is his failure to really accept
22  responsibility.  Thank you.

23          **PRESIDING COMMISSIONER MOORE:**  Thank you,
24  sir.  Thank you for your comments.
25  Ms. Christensen.

26          **ATTORNEY CHRISTENSEN:**  Mr. Smith is an
27  excellent candidate for parole.  I've been working

1   with him for quite a while now and he never fails
2   to impress me with his wonderful skills at brail
3   translation.  And I know that he is going to do a
4   lot of good for society working in that area.
5   Mr. Smith feels great remorse for this crime.  It
6   was not like him to do something like this.  He
7   comes from a nice family.  These people were his
8   friends.  He was not involved in gangs.  He did not
9   have a lengthy criminal history.  What caused this
10  incident to occur was a combination of alcohol and
11  meth which he truthfully said he had been involved
12  in all week, plus he had been sleep-deprived.  His
13  lifestyle at the time was unhealthy.  His judgment
14  was impaired.  And he simply did not have the
15  degree of self-awareness and understanding and the
16  skills and tools in order to turn away from that
17  and to do the right thing.  He was immature.  It
18  was a question of very poor judgment at the time.
19  He did turn himself.  He did not have a trial.
20  Ever since then, he has been consistently trying to
21  improve himself.  He avails himself of all
22  opportunities herein within the prison to be a good
23  inmate.  He's constantly participated in many, many
24  self-help groups over the years.  He reads books on
25  his own.  NA, consistently.  He's always working
26  his program.  Yes, he had a relapse back in 1997.
27  But people who have substance abuse problems will

59

1    from time to time do that.  But what's the
2    important thing is he was on that horse, he fell
3    off the horse, he got right back on that horse.
4    And he kept on going.  He stayed on track.  In
5    fact, that made him a stronger person.  Why.
6    Because that made him realize the importance of
7    those 12-steps.  It wasn't just something that he
8    read, but a personal realization that he had to go
9    through himself.  Mr. Smith is fully prepared to go
10   out into the world today and be self-supporting.
11   We can't worry about the budget and what could
12   happen if he didn't get this job or that job or
13   whatever.  Mr. Smith will be able to find work
14   -- immediate work.  He has a job offer, paying good
15   money, doing good things for society as a brail
16   transcriber.  He has an elderly mother who loves
17   him, wants him to come home, stay with her.  He has
18   other supportive family members in the area.
19   Mr. Smith is going to continue to involve himself
20   in substance abuse out on the street.  He will be a
21   success on parole, absolutely.  There's no doubt in
22   my mind.  I believe that the counselor's assessment
23   that he's an unpredictable degree of threat is
24   something that is to be disregarded, totally.  And
25   I would ask the Board to adopt his psychologist's
26   assessment who -- The psychologist is a
27   professional.  And I think that the psychologist's

60

1   conclusion that Mr. Smith's crime was situational.

2   He presents a very low degree of threat.  That is

3   the accurate statement.  Please parole Mr. Smith.

4   Thank you.

5          PRESIDING COMMISSIONER MOORE:  Thank you,

6   ma'am.  Thank you for your comments.  Now,

7   Mr. Smith, it's your opportunity to make a

8   statement if you desire.

9          INMATE SMITH:  Yes, I do.  Thank you for

10  hearing my application for parole.  All I can say

11  is that I've done everything I can to better myself

12  so I can be a productive member of society.  And I

13  feel I'm absolutely no threat to anyone.  Thank

14  you.

15         PRESIDING COMMISSIONER MOORE:  Thank you,

16  sir.  We'll recess now and let you know our

17  decision.

18                      R E C E S S

19                       --o0o--

20

21

22

23

24

25

26

27

61

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3        PRESIDING COMMISSIONER MOORE:  We on the

4    record?

5        DEPUTY COMMISSIONER BACHLOR:  We're on the

6    record, Sir.

7        PRESIDING COMMISSIONER MOORE:  All right.

8    Thank you.  Let the record show that all interested

9    parties have returned to the room.  Vincent Smith,

10   CDC number C as in Charlie, 99842.  The Panel has

11   reviewed all of the information received from the

12   public and relied on the following circumstances,

13   Mr. Smith.  Mr. Smith, this is a one-year denial --

14   another one-year denial, sir.  [The Panel found that

15   the committing offense was paramount in the timing

16   and the gravity of the committing offense.  The

17   offense was carried out in an especially vicious

18   and brutal manner.  The offense was carried out in

19   a dispassionate and calculated manner in that you

20   went out to your vehicle -- your truck and came

21   back in with a loaded 22-rifle and just about

22   emptied the rifle into the victim.  The offense was

23   carried out in a manner which demonstrates

24   exceptionally insensitive disregard for human

25   sufferings in that he was shot 14 times, four or

26   five of those was to -- were to the head.] [The

27   VINCENT SMITH  C-99842.  DECISION PAGE 1  07/09/03

62

1    motive for the crime was inexplicable or very

2    trivial in relationship.] This was over jealousy,

3    Mr. Smith, you told us today.  But I find it hard

4    to believe that it was over protecting someone's

5    vanity, if you will.  Virginity, I guess, would be

6    another word.  You arrived at Annette Miller's

7    cabin around 6:30.  The victim was already there

8    visiting.  At approximately seven o'clock, you went

9    to your pickup truck and you returned to the cabin

10   with a loaded 22-rifle.  You shot the victim,

11   killing the victim.  Then it says, shot him some 14

12   times in the body and in the head, which caused his

13   demise.  These are the -- The conclusions were

14   drawn from the Statement of Facts wherein you

15   caused the demise of Robert Darling.  He was 25

16   years of age.  And he was a friend of yours, too.

17   You shot him with a 22-rifle.  You had been

18   intoxicated that day with alcohol and

19   methamphetamine.$^3$ [Previously record, the prisoner

20   has a record of violent assaultive behavior in that

21   as a juvenile, you threatened to assault with a

22   broken shotgun passers-by on a horse.]$^4$ [You have a

23   history of unstable and tumultuous relationships

24   with others.]$^5$ [You had a problem with substance

25   abuse of alcohol and drugs as you were on the

26   alcohol and meth that particular day of the instant

27   **VINCENT SMITH  C-99842   DECISION PAGE 2  07/09/03**

63.

1    offense.] [You failed previous grants of probation,

2    cannot be counted upon to avoid criminality.]

3  7[Institutional behavior, the prisoner has not

4    sufficiently participated in beneficial self-help

5    and therapy programming at this time.] [Psychosocial

6    report, inadequate parole plans and inadequate --

7    3042 Notices, the Hearing Panel notes responses to

8    3042 Notices indicate opposition to a finding of

9    suitability.] [Specifically, the District Attorney's

10   office of Lake County had a representative present

11   here today in opposition as well as a letter from

12   the sheriff's department dated April the 16th of

13   2002, authored by the letterhead of the chief of --

14   or the chief -- the sheriff of the County of Lake

15   as well as it was signed, however, by Jeffrey B.

16   Marcum, Chief Deputy of the Sheriff.  This was the

17   law enforcement agency which investigated the

18   particular incident.] [Other information bearing on

19   his suitability would be that the prisoner's

20   counselor, a CC-One H. Macias-Graham, wrote in the

21   current Board report that the prisoner would pose

22   an unpredictable degree of threat if released to

23   the public at this time.] Remarks, the Panel makes

24   the following findings:  That the prisoner should

25   be commended.  He's participated in AA, been

26   disciplinary-free since 1997.  Had a minor

27   VINCENT SMITH  C-99842   DECISION PAGE 3  07/09/03

64.

1    (indiscernible) at that time as we've discussed

2    today.  He had one 128.  Positive work reports.

3    Doing an excellent job as a brail transcriber.  Has

4    a couple of vocations under his belt.  However,

5    these positive aspects of his behavior don't

6    outweigh the factors of unsuitability at this time.

7    Mr. Smith, you need to come to terms, clearly, with

8    what you did -- the transgression -- why you

9    transgressed in this particular crime to take the

10   life of a friend over an issue that clearly seems

11   to be more than just to defend someone else's

12   honor.  As I said, this is a one-year denial.

13   Recommendations to you, sir, are to remain

14   disciplinary-free.  If it's available to you, to

15   participate in beneficial self-help programming to

16   better understand the causative factors -- what

17   caused you to commit this crime.  What caused you

18   to take a friend's life.  This would conclude the

19   reading of our decision today, Mr. Smith.  The time

20   is seventeen twenty hours.  Commissioner, any

21   comments to the prisoner?

22           DEPUTY COMMISSIONER BACHLOR:  I have some

23   brief comments.  I think, in the next year, if you

24   have it available to you if you could attend self-

25   help groups such as Breaking Barriers or there's

26   something called Straight Life Possibly or

27   VINCENT SMITH  C-99842   DECISION PAGE 4  07/09/03

1   something that would give you more contact

2   interactions with people, maybe, from the community

3   of some sort, if possible.

4           INMATE SMITH:  Okay.

5           DEPUTY COMMISSIONER BACHLOR:  I think it

6   would do you well.  And in addition, I went over

7   your book reading list.  And I think if you can

8   direct your attention more towards some type of

9   anger management or meditation-type self-awareness,

10  self-esteem --

11          INMATE SMITH:  The list you read was books

12  that I had read for the project.

13          DEPUTY COMMISSIONER BACHLOR:  Okay.  Well,

14  there was two different books here.  And I thought

15  one of them was the ones that you transcribed for

16  the project.

17          INMATE SMITH:  Well, one, yeah.

18          DEPUTY COMMISSIONER BACHLOR:  And then there

19  was one you read for the project.

20          INMATE SMITH:  Yeah.

21          DEPUTY COMMISSIONER BACHLOR:  Okay.  Both of

22  them --

23          INMATE SMITH:  Some that I read on the tape

24  for the project --

25          DEPUTY COMMISSIONER BACHLOR:  Okay.

26          INMATE SMITH:  The other one's I transcribed

27  VINCENT SMITH  C-99842   DECISION PAGE 5  07/09/03

66.

1    in brail for the project.

2        DEPUTY COMMISSIONER BACHLOR:  All right.  My

3    recommendation is to do some reading on your own

4    for self-esteem and anger management, basically, is

5    what I would recommend.  And then makes notes of it

6    of what books you read and how those impacted you.

7    And be ready to talk about that, too, when you come

8    before the Panel next year.

9        INMATE SMITH:  Okay.

10        DEPUTY COMMISSIONER BACHLOR:  But we think

11    you're on the right track.  All right.

12        PRESIDING COMMISSIONER MOORE:  How to put

13    them to use.

14        DEPUTY COMMISSIONER BACHLOR:  Yeah.  All

15    right.  Good luck to you, sir.

16        INMATE SMITH:  Thank you.

17        PRESIDING COMMISSIONER MOORE:  Good luck,

18    Mr. Smith.

19                      --o0o--

20

21

22

23

24

25    PAROLE DENIED ONE YEAR
                                    OCT - 7 2003
26    FINAL DATE OF DECISION _____

27    VINCENT SMITH  C-99842   DECISION PAGE 6  07/09/03

67

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATTY DAVIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 66, and which recording was duly recorded at FOLSOM STATE PRISON, at REPRESA, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of VINCENT SMITH, CDC No. C-99842 on JULY 9, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 28, 2003, at Sacramento County, California.

Patty Davis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT

"C"

VINCENT SMITH

V.

JOHN SALAZAR, WARDEN (A)

INMATE COPY

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## SUBSEQUENT LIFER HEARING
## MAY 2002 CALENDAR
## FOLSOM STATE PRISON

### SMITH, VINCENT (C-99842)

## PSYCHOSOCIAL ASSESSMENT

Mr. Smith was interviewed on 02/05/02 for 40 minutes. The prior Psychological Evaluation completed on 03/23/00 by O. S. Glover, Ph.D. is still current and valid. In that evaluation Dr. Glover noted that violence potential in comparison to other inmates was below average. I agree and believe the violence potential is extremely small in this case. The Commitment Offense was very situational and not at all likely to recur. Mr. Smith makes a very positive presentation. He has sincere feelings of remorse. He has been programming in an outstanding manner. He is certified in Braille and is skilled in all other aspects of the Blind Project Program. He will be able to continue working in this field on release. He has strong family support in the community. There are no psychological factors in this case that would interfere with release planning. He is an excellent candidate for parole. Prognosis for successful adjustment in the community is excellent.


*Melvin Macomber, PhD*
MELVIN MACOMBER, PH.D.
Clinical Psychologist

C - 1

# FOLSOM STATE PRISON
BOARD OF PRISON TERMS
LIFE-TERM MENTAL HEALTH EVALUATION (Revised 1998)

### *FOR THE CALENDAR MONTH OF MAY 2000*

## PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Mr. Vincent Smith is a 37-year-old First Term, Caucasian American male who appears before the Board of Prison Terms evaluation after Fifteen Years of CDC incarceration for the Instant Offense of Second Degree Murder. He is serving a Fifteen Year To Life sentence with a Two Year Enhancement of his term for the Use of a Firearm. This is the fourth such appearance for Inmate Smith and the sixth Report to the Board of Prison Terms for Mr. Smith.

**SOURCES OF INFORMATION:** This evaluation consists of a 60-minute interview with the inmate which occured on 03/23/00. Prior to the interview I reviewed his Central File and his Unit Health Record.

**DEVELOPMENTAL HISTORY:** Mr. Smith's developmental, psychological, and social factors have been well documented in previous reports and need not be repeated in details in this instance. The reader is also referred to previous reports on this inmate particularly a report offered by Jerre L. Lender, Ph.D., Supervising Senior Psychologist, Folsom State Prison.

**EDUCATION:**

**FAMILY HISTORY:** Mr. Smith was born in San Francisco. Shortly after his birth his family moved to Half Moon Bay where they remained until he was approximately age thirteen.

The inmate grew up in an intact family in Half Moon Bay. His father was a Journeyman Carpenter and the inmate informs me that his father was also, by definition, an alcoholic. His father's demise came about 10-years-ago. His mother was homemaker during the time in which he grew up. The inmate has one brother and two sisters. The family eventually moved to Loc Loman in Lake County where he attended school, graduating from K.C. High School in Kelseyville in 1980.

C-2

**PSYCHOSOCIAL DEVELOPMENT & SEXUAL ORIENTATION:** There is no notable psychosocial history or abnormal sexual orientation.

**MARITAL HISTORY:** Mr. Smith is not married.

**MILITARY HISTORY:** Mr. Smith has no military history.

**EMPLOYMENT/INCOME HISTORY:** Mr. Smith has previously worked as an apprentice carpenter on the outside.

**SUBSTANCE ABUSE HISTORY:** Mr. Smith abused Methamphetamines, extensively, when in the free community.

**PSYCHIATRIC AND MEDICAL HISTORY:** There is no prior psychiatric history.

**PLANS IF GRANTED RELEASE:** Mr. Smith plans to continue his work for the Department of Education in the Project for the Blind, developing Braille for blind students.

## CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:** Mr. Smith is a 37-year-old well-nourished male inmate who is small in stature and thin in size. He appears his stated age. He was neatly dressed, well groomed, pleasant, and an affable person to speak with. He is very friendly and has a friendly smile on his face. He is of at least average intelligence with a reserved air about him. He was oriented to time, place, and person. His speech is clear, coherent, and goal-directed. There is no evidence of psychosis, delusional thinking, or paranoid ideations. There was no evidence of a psychotic process present. He was quite lucid and was very candid in this interview with me. He has a full range of affect. He denies visual and auditory hallucinations. There is no evidence of homicide/suicide. The inmate's short and long term memory appear within normal limits. His judgment/insight also appear within normal limits. The inmate was able to do serial-sevens without incident. He could count backwards from a hundred. He could answer standard proverbs indicating that he had the ability to think in the abstract.

**DIAGNOSTIC IMPRESSIONS:**

| | | |
|---|---|---|
| Axis I: | 305.00 | Alcohol Abuse, by History only. |
| | 305.70 | Methamphetamine Abuse, by History only. |

| | | |
|---|---|---|
| Axis II: | V71.09 | No diagnosis. |
| Axis III: | | Medical Condition: Refer to the Unit Health Record. |
| Axis IV: | | Psychosocial Stressors: Incarceration. |
| Axis V: | | GAF = 96. |

Mr. Smith does not have a crime which is related to a mental condition. At the time that he committed the Instant Offense he had been using and abusing alcohol and amphetamines. His cognitive controls and executive function were impacted by these illicit street substances which reacted on his controls resulting in the unfortunate lose of the life of another. He is not currently mentally ill and has good goals.

Mr. Smith admits he blundered about two years ago when he was found to be in possession of Heroin. He indicates, that this was at a time when his father and his brother had expired just ten days apart. Mr. Smith informs me that he was overwhelmed by a double demise as this, and subsequently felt very guilty and became vulnerable to those around him, resulting in his use of Heroin in an attempt to make his symptoms go away.

In my opinion, I doubt seriously that this will ever occur again and the best judge of future behavior is past behavior. This inmate has had an impeccable prison record until this offense two-years-ago. This is the inmate's first CDC 115 and until the time that he received this 115, he had had an outstanding prison record.

The inmate's adjustment in the past fifteen years has been quite amazing. He utilizes all resources available to him, i.e., Narcotics Anonymous, Alcoholics Anonymous, and other self-help groups. He currently works in education converting language into Braille language for the blind. He told me that the Department of Education has agreed to hire him upon his release from CDC.

**REVIEW OF LIFE CRIME:** The inmate was quite candid with me in reviewing the facts of the Instant Offense and related the following: Sometime early in the year of 1984, he was unsure of the exact date, the inmate informs me that he was dating a young female and was fearful that she was going to be raped by a companion friend. This friend followed he and his female friend and refused to leave. Fearing for his safety and the thought that he might rape, the inmate shot and fatally wounded the victim, later tossing the gun to the side and from this point on he indicates that are rather fuzzy and he is not exactly sure what all of the facts. He was quite candid in relaying to me as well as he could, the facts of the Instant Offense. It

also appeared that while relaying these facts that he was visibly shaking and recanting these events. The inmate related facts of the Instant Offense, indicating that he and a friend had been drinking at his house with his girlfriend. Mr. Smith stated that his friend started coming on to his girlfriend, who became a bit upset and left. She went home followed by the victim as did the inmate. Arriving at her home his girlfriend asked the victim to leave her house. He refused indicating that he was not leaving until he got something. With that he became fearful that his friend had intended to rape his girlfriend. Fearing for her safety the inmate was afraid that his friend intended to rape his girlfriend and perhaps injure her. He subsequently picked up a gun and fired it. He says he doesn't remember much about it and was obviously somewhat shaken in talking about the subject. He told me that he could not remember much else from the incident. The inmate then told me that he and his girlfriend and the victim had been drinking and that he and his friend had both probably used very poor judgment because they had also been using Methamphetamines. The inmate's intention, in my opinion, was an attempt to protect his girlfriend from rape and did not make any malicious effort at harming his friend. I believe he acted on impulse. Also, in the mind of the inmate, he is convinced that he was simply trying to prevent his girlfriend from a sexual assault but had no intentions of actually destroying his friend's life. He feels that if he had not been under the influence of alcohol and amphetamines that this would probably not have happened because he would have used better judgment.

**ASSESSMENT OF DANGEROUSNESS:** Mr. Smith, in my opinion, does not present a negligent risk factor to society if paroled. There are no psychological factors that would impede his parole.

**CLINICIAN OBSERVATION/COMMENTS/RECOMMENDATIONS:** There are no other comments at this time.

O.S. Glover, Ph.D.
Clinical Psychologist

EXHIBIT

"D"



**DELAINE EASTIN**
State Superintendent of Public Instruction

CALIFORNIA
DEPARTMENT
OF
EDUCATION
721 Capitol Mall
P.O. Box 944272
Sacramento, CA
94244-2720

May 9, 2002

Mr. Vincent Smith
C/0 Mr. Bob Schmitz
Folsom Project for the Visually Impaired
P.O. Box 6422
Repressa, CA 95763-6422

Dear Mr. Smith:

I would like to thank you for your initiative and time that you have devoted to brailling textbooks for California's visually impaired children. As you know, Braille is a very difficult and technical skill to acquire. When describing your Braille skills, Ann Kelt, the CSMT's Braille formatter, used words like "excellent" and "superb." Ann doesn't give compliments unless she means them, so I know you must be quite accomplished. Ann has also told me that you are quite proficient in utilizing the publisher's file to translate text into Braille, which will soon be the standard in Braille transcription.

It is the responsibility of the Clearinghouse for Specialized Media and Technology (CSMT), a unit within California's Department of Education, to ensure that braille versions of state-adopted textbooks, workbooks, and other print materials are available to all California students who are blind and attend public elementary and middle schools. For the last few years, the CSMT has contracted with eligible transcribers who wish to be paid for their work (including two former FPVI transcribers). Using specifications provided by the CSMT, individuals certified by the Library of Congress have the opportunity to transcribe state-adopted learning resources. Production must comply with applicable codes and include appropriate tactile illustrations and descriptions of objects, people, and places. All transcription is proofed for quality control by a certified proofreader or other transcriber as determined by the CSMT.

The following payment schedule utilized by the CSMT is based on an experienced braillist's ability to earn approximately $18.00 per hour and sets the payment standard throughout California.

| | | |
|---|---|---|
| Braille Transcription – Textbook | $ 3.50 per Braille page | Proofing  $1.00 per page |
| Braille Transcription – Music | $ 4.00 per Braille page | Proofing  $1.50 per page |
| Braille Transcription – Math | $ 4.00 per Braille page | Proofing  $1.50 per page |

Due to the shortage of qualified transcribers in the United States, opportunities for employment abound. In addition to the California Department of Education-CSMT, a number of other organizations actively recruit Braille transcribers certified by the Library of Congress. In the event that the CDE cannot provide employment, we would most certainly be able to provide references to these organizations for transcribers such as yourself, who have successfully provided Braille for use in California classrooms.

Sincerely,

Rod J. Brawley, Director
Clearinghouse for Specialized Media and Technology

RB:jv

D-1

April 18, 2002

PO Box 1482
Cobb, CA 95426

To Whom It May Concern:

I am writing this letter in reference to my son Vincent Smith C99842, an inmate at
Folsom State Prison. Vincent is coming up for parole on May 16. Over the course of the
past six months I suffered a debilitating injury that has forced me to move from my home
and under go surgery, with another surgery pending. During this time I have lived with
my daughter and her family causing an enormous strain. Having Vincent here would
allow me to rehabilitate in my own home. My home is over 40 years old and in need of
constant repair, Vincent is also trained as a Journeyman carpenter which would provide
him the skills needed in the maintenance and upkeep of my home. During Vincent's time
at Folsom he has also been trained in Braille transcription, and is now certified in this
area. Should Vincent be paroled he would have the constant support of my daughter's
family and myself. Thank you for your consideration in this matter.

Sincerely:

Dagmar G. Smith

*Dagmar G. Smith*

D-2

April 18, 2002

PO Box 1052
Cobb, CA 95426

To Whom It May Concern:

I am writing this letter on behalf of my brother, Vincent Smith C99842, who is an inmate at Folsom State Prison. Vincent will be coming up for a parole hearing on May 16, 2002. While an inmate at Folsom, Vincent has been trained in Braille and is now certified in Braille Transcription. This skill will allow him to find employment in any location. Prior to his incarceration Vincent was a Journeyman carpenter in the union and could also return to that position. In the past 5 years Lake and neighboring counties have experienced a building boom making carpentry positions readily available. In the event that you decide to parole Vincent at this time, he will have the support of our mother and my family. In the past six months our mother has suffered from a debilitating injury that has prevented her from returning to her own home. She is in need of daily assistance to help her with the rehabilitation process and we feel Vincent would be an immense help to her at this time. Our mothers house is currently vacant Vincent would be living there and helping her with the general maintenance and upkeep of the home. The home is located at 10710 Foothill Rd. Loch Lomond, CA. I thank you for your consideration in this matter and would like to stress that at this time it would be advantageous for our family to have Vincent paroled to help out with the care of our mother.
Sincerely:

Janet L. Smith

D-3

STATE OF CALIFORNIA

CALIFORNIA COMMUNITY COLLEGES
CHANCELLOR'S OFFICE
1102 Q STREET
SACRAMENTO, CA 95814-6511
(916) 445-8752
HTTP://WWW.CCCCO.EDU



To Whom It May Concern:

August 26, 2001

We are writing this letter of recommendation for **Vincent Smith**.

The California Community Colleges Chancellor's Office has initiated two joint projects with the California Department of Corrections, Folsom State Prison through the Folsom Project for the Visually Impaired. The *Alternate Text Partnership Project* is intended to provide accurate and timely access to textbooks and course materials for students with disabilities. This project provides electronic text, Braille, large print, and tactile graphics to students with disabilities who cannot access or process printed materials (such as students whom are blind and/or have learning disabilities). The *Accessible Instructional Media Services Project* is intended to provide accurate and timely access to audiovisual materials for students with disabilities. This project provides off-line captioning of video materials for students with disabilities who cannot access or process auditory information contained on audiovisual materials (such as students whom are deaf/hard-of-hearing and/or have learning disabilities).

**Vincent Smith** has contributed to the success of these projects. He has received specialized certification as a Library of Congress Braille Transcriber (Literary). This professional certification is nationally recognized, and qualifies him to translate written text to Braille for use by individuals who cannot read printed materials. **Vincent Smith** has been producing Braille materials for non-profit organizations and public agencies. He is familiar with Ed-It PC and Duxbury Braille Translation software applications. In addition, **Vincent Smith** has been producing audiotapes as part of the California Department of Education-Books on Tape Program. Most recently, **Vincent Smith** has acquired the skills and knowledge to successfully operate specialized captioning software, and produce accessible audiovisual materials for individuals with disabilities. At last, **Vincent Smith** is competent to operate the Humphreys Zeiss Lens Analyzer to identify the specifications of prescription eyewear donated to the Lion's Club International Organization for dissemination to individuals with poor or reduced vision in low-income neighborhoods and third world countries. **Vincent Smith** provides all of the hardware and software technical support for the two projects. He has developed an expertise in the operation of automated applications, and it is our hope to expand the projects to include assistive technology and the evaluation of websites for accessibility.

**Vincent Smith** has participated in training provided by California Community College special consultants, as well as, training provided by high-level professional staff from companies engaged in the field of alternate media. Given the highly specialized and sought after skills possessed by **Vincent Smith**, he will be competitive for alternate media positions at each of the 108 California Community Colleges throughout the state. His production with our joint projects has benefited students with disabilities, and we expect these projects to continue to benefit thousands of additional students with disabilities in the future.

If you have any questions, or would like more information, please contact Peggy Tate, Disabled Students Programs and Services Specialist, at 916-322-3234.

Judith R. James, Vice Chancellor

Lindy Williams, Dean

Scott Hamilton, DSP&S Coordinator

Peggy Tate, DSP&S Specialist

D-4

# CERTIFICATE OF PROFESSIONAL DEVELOPMENT

This Certificate Is Awarded To

## Vincent Smith

For Participation in and Successful Completion Of The
Accessible Electronic Media Operations

## ADVANCED RAPID CAPTION SYSTEM TRAINING

Under Sponsorship of the Chancellor's Office – California Community Colleges
And

**RAPIDTEXT**

On this 17th day of August 2001

_Scott Hamilton_
Scott Hamilton, DSP&S Statewide Coordinator
Chancellor's Office – California Community Colleges

_Peggy Tate_
Peggy Tate, DSP&S Specialist
Chancellor's Office – California Community Colleges

_Glory L. Johnson_
Glory L. Johnson, Vice President
RapidText

_Jason Terando_
Jason Terando, Manager
RapidText

D-5



# Folsom Project For The Visually Impaired

Volunteer Service To The Visually Impaired          Post Office Box 6422
Folsom, Ca. 95763



Board of Prison Terms
428 J. Street
Sacramento, CA   95814                                              March 19, 2002

**RE: SMITH, Vincent (C99842)**

Dear Board of Prison Terms,

My name is Bob Schmitz and for the past eleven years I have been a Correctional Officer at Folsom State Prison. I have a Masters degree in Human Behavior, and am retired from private industry as a Vice President from Willitts Designs, a thirty million dollar corporation.

On August 11, 1997, I was assigned as the Program Supervisor for the Folsom Project for the Visually Impaired (FPVI). I have 20 inmates working full-time for this project and Vincent Smith (C-99842) is one of them. He has been here for approximately eighty-four months. Inmate Smith committed himself to this program, looking for something more meaningful to do with his life, and in the time I have supervised him, has excelled far beyond the average inmates within this institutional setting.

Mr. Smith started out as a reader, putting books onto tape with his inception into this program. Although Mr. Smith does not receive much in monetary gain, he has repeatedly stated how much satisfaction he receives from the work he is doing for people all over the world. Mr. Smith is truly an asset to this program and it shows through his dedication and commitment.

Mr. Smith has also taken the Braille course and was certified through the Library of Congress in the transcription of English into Braille in April of 1998. He has seen the need in the Visually Impaired community and truly wants to help in whatever capacity he can. Since being certified in Literary Braille, Mr. Smith has transcribed approximately 31 books for the Department of Education, and has excelled at learning and mastering the Textbook Format required for completing these transcriptions. Mr. Smith has also done numerous other transcriptions for other State agencies, including the BPT, and is currently transcribing the Title 15 for CDC. Mr. Smith is a Braille instructor, with one student at this time.  Mr. Smith has also been offered employment as a Braillist for the Department of Education upon his release. Further, the California Community Colleges have expressed interest in hiring him upon release also.

Mr. Smith is an exemplary employee. He works well with staff and others and is always courteous and helpful. I have seen much growth in Mr. Smith as an employee and as an individual.

Sincerely,

Robert Schmitz
Correctional Officer
Folsom State Prison

D-6



DEPARTMENT OF
REHABILITATION
*Employment, Independence & Equality*

Certificate of Appreciation

Presented to

*Folsom Project for the Visually Impaired*

In recognition of your commitment to excellence and to expanding equal opportunity
to persons with disabilities for learning, working, and living independently

September 25, 2002
Date

Catherine Campisi, Ph.D.
Director

D-7

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY

GRAY DAVIS, GOVERNOR

## BOARD OF PRISON TERMS
1515 K Street, 6th Floor
acramento, CA 95814



March 20, 2002

Mr. Bob Schmitz
Program Director
Folsom Project For The Visually Impaired
P.O. Box 6422
Folsom, California 95763-6422

Dear Mr. Schmitz:

I would like to express my sincere appreciation to you and your team for the outstanding job of translating the Board of Prison Terms (BPT) forms into Braille and audiocassette at no cost.

Your ability to produce quality documents in an alternate format(s) will enable the BPT to accommodate inmates and parolees with disabilities and assure that they are able to effectively participate in parole proceedings. Because of you and your staff and the excellent work that was done, the BPT has moved one step closer to compliance with the Americans with Disabilities Act.

Sincerely,

MARVIN E. SPEED II
Executive Officer

SS/ss

cc: Carol Daly
    Diane Butler CDC
    Maggie Watts

D-8

**VINCENT SMITH C-99842**

# The International Association of Lions Clubs

(Lions Clubs International)



We Serve

DON RING
DISTRICT GOVERNOR, DISTRICT 4-C5
CALIFORNIA, 1989-1990
4620 MARTSMITH WAY
FAIR OAKS, CALIFORNIA 95628

Ladies and Gentlemen of the BPT:

With this letter I register my vote of confidence in the attitudes and abilities of the men who work at the Folsom Project for the Visually Impaired.

My knowledge of this program is extensive because I've been involved since its inception. As District Governor for 70 regional clubs of Lions International I helped procure the grant that provided start-up capital in 1989. For the past 13 years I have visited regularly to monitor progress and have witnessed development surpassing all expectations. The program was founded to aid the blind, not as a vehicle for inmate advancement; but it has succeeded in both respects largely due to the effort and initiative of the prisoners. We presented them an opportunity—they made it a success.

As a member of the Folsom Project, former life-term prisoner William Cloud was an agent of change and improvement. He was granted parole three years ago and today stands as the best example of the reformative power of this enterprise. Upon release, in rapid succession he acquired a job, was promoted to management and started his own business. His exemplary performance on parole was the deciding factor in a subsequent award to FPVI of an additional $65,000 of Lions International funds.

I first came to this prison as a vocational sheet metal instructor in the 1970's and recall clearly the inmates' propensity to give as little as possible and take as much as they could. What I find today in the demeanor of FPVI employees is the exact opposite—proof that work which is both purposeful and beneficial to those in need can and does turn lives around.

CDC was correct to sponsor a program like the Folsom Project within its institution. It is my opinion that they would again be correct to allow men who have served their time to rejoin their communities with skills that make meaningful employment a certainty.

Sincerely

Don Ring

D-9

ALCOHOL & OTHER DRUG SERVICES - LIST OF SELF HELP GROUP
Answering Service, 263-2414 Alano Club, 263-8545
NARCOTICS ANONYMOUS 1-800-836-8685

**SUNDAY:**

| | | | | | |
|---|---|---|---|---|---|
| Clearlake Oaks | -0- | Group | | | |
| Lakeport | -0- | Came to Believe | 12476 Plaza St. | 7:00 | pm |
| Lakeport | -C- | Discussion | Alano Club | 9:00 | am |
| Lower Lake | -0- | Nooners | Alano Club | 7:00 | pm |
| Lower Lake | -0- | Relationships in Sobriety | Central Office | Noon | |
| *Nice | -0- | Spiritual Connection | Central Office | 8:00 | pm |
| | | | North Shore Resort | 2:00 | pm |

**MONDAY:**

| | | | | | |
|---|---|---|---|---|---|
| Clearlake | -0- | Monday Night Meeting | 1ST. Babtist Church | | |
| Lakeport | -C- | 12-Step Study | Alano Club | 6:00 | pm |
| Lakeport | -0- | Big Book Study | Alano Club | Noon | |
| Lower Lake | -0- | Thank God I'm Sober | Central Office | 8:00 | pm |
| Lower Lake | -0- | Attitude Adjustment | Central Office | 8:00 | am |
| Lower Lake | -0- | Beginners | Central Office | Noon | |
| *Nice | -0- | Movers & Doers | North Shore Resort | 8:00 | pm |
| | | | | 7:00 | am |

**TUESDAY:**

| | | | | | |
|---|---|---|---|---|---|
| *Nice | -0- | Morning Group | Northshore Resort | 7:00 | am |
| Lakeport | -0- | Early, Early Bird | Alano Club | 9:00 | am |
| Lakeport | -0- | Noon Group | Alano Club | Noon | |
| Lakeport | -0- | Beginners Group | Alano Club | 8:00 | pm |
| *Lower Lake | -0- | Serenity Group | Central Office | 10:00 | am |
| Lower Lake | -0- | Reflections Study | Central Office | Noon | |
| Lower Lake | -0- | Women's Group | Central Office | 6:00 | pm |
| Middletown | -C- | Higher Powered | Central Office | 8:00 | pm |
| *Clearlake | -0- | Men's Stag | Camp Salesian | 8:00 | pm |
| | | Big Book Study | 1ST Baptist Chuch | 6:00 | pm |

**WEDNESDAY:**

| | | | | | |
|---|---|---|---|---|---|
| *Clearlake | -0- | Clear Path Group | Pearl St. Methodist Ch. | 7:00 | pm |
| *Nice | -0- | Daily Reflections | North Shore Resort | 7:00 | am |
| Lakeport | -0- | Big Book Study | Alano Club | Noon | |
| Lakeport | -0- | Morning Group | Alano Club | 9:00 | am |
| Lakeport | -0- | Arms Length/Out Level | Alano Club | 8:00 | pm |
| *Lower Lake | -0- | Fresh Air Group | Central Office | 8:00 | am |
| Lower Lake | -0- | Nooners | Central Office | Noon | |
| Middletown | -0- | Unity Group | Senior Center | 8:00 | pm |
| *Riviera | -C- | Riviera Meeting | Community Center | 8:00 | pm |

**THURSDAY:**

| | | | | | |
|---|---|---|---|---|---|
| *Clearlake | -0- | Step/Tradition | Pearl St. Methodist Ch. | 7:00 | pm |
| Clearkake | -0- | Chemical Dependency | Calvary Baptist | 7-8:30 | pm |
| *Nice | -0- | Be Positive | North Shore Resort | 7:00 | am |
| Lakeport | -0- | How-To Group | Alano Club | 9:00 | am |
| Lakeport | -0- | Noon Group | Alano Club | Noon | |
| Lakeport | -0- | Lakeport Group | Alano Club | 8:00 | pm |
| Lower Lake | -0- | Nooners | Central Office | Noon | |
| Lower Lake | -0- | Alpha Step Study | Central Office | 8:00 | pm |
| Lower Lake | -0- | Women's Group | Methodist Church | 7:00 | pm |

**FRIDAY:**

| | | | | | |
|---|---|---|---|---|---|
| *Nice | -0- | Early Birds | North Shore Resort | 7:00 | am |
| Lakeport | -0- | Friday Noon | Alano Club | Noon | |
| Lakeport | -0- | 12-Step Study | Alano Club | 8:00 | pm |
| Lakeport | -0- | Spanish Speaking | Alano Club | 8:00 | pm |
| *Lower Lake | -0- | 12 Step Study | Central Office | Noon | |
| Lower Lake | -0- | As Bill Sees It | Central Office | 8:00 | pm |
| *Middletown | -0- | Fireside Group | 21191 Stewart | 8:00 | pm |
| *Clearlake | -0- | Clear Path Group | Pearl St. Methodist Ch. | 6:00 | pm |

**SATURDAY:**

| | | | | | |
|---|---|---|---|---|---|
| *Kelseyville | -0- | Discussion Group | Methodist Church | 8:00 | pm |
| Lakeport | -0- | Morning Group | Alano Club | 9:00 | am |
| Lakeport | -C- | Women's Discussion | Alano Club | Noon | |
| Lakeport | -0- | Candlelight Meeting | Alano Club | 10:00 | pm |
| Lower Lake | -0- | There is a Solution | Central Office | Noon | |
| Lower Lake | -0- | Sat. Nite Live/Big Book | Central Office | 8:00 | pm |
| *Nice | -0- | Recovery Today | North Shore Resort | 2:00 | pm |
| Middletown | -0- | Straw Hat Group | Camp Salesian | 8:00 | pm |
| Clearlake | -0- | Saturday Night Live | Treasure Cove Pizza | 11:00 | pm |
| | | (pizza and soda 1/2price 10:00-11:00pm)) | | | |

## NARCOTICS ANONYMOUS

| SUNDAY | -0- | Clearlake | Treasure Cove Pizza | 9:00 pm |
| MONDAY | -0- | Lakeport | Jaba Java Junk | 12:00 pm |
| *MONDAY | -0- | Lucerne | Clubhouse, Hwy. 20 | 6:00 pm |
| TUESDAY | -0- | Lakeport | Alano Club | 12:00 pm |
| WEDNESDAY | -0- | Lakeport | Alano Club | 7:00 pm |
| THURSDAY | -0- | Lakeport | Alano Club | 12:00 pm |
| FRIDAY | -0- | Lakeport | St. Johns Episcopal | 6:00 pm |
| SATURDAY | -0- | Clearlake | Treasure Cove Pizza | 10:00 pm |
| SUNDAY | -0- | Lakeport | Alano Club | 12:00 pm |

## ALANON

| *MONDAY | -0- | Nice | North Shore Resort | 7:00 pm |
| TUESDAY | -0- | Lower Lake | Methodist Church | 7:00 pm |
| TUESDAY | -0- | Lakeport | Alano Club | 8:00 pm |
| WEDNESDAY | -0- | Middletown | 12 Step House | 8:00 pm |
| *THURSDAY | -0- | Clearlake | Pearl St. Methodist Ch. | 7:00 pm |
| THURSDAY | -0- | Lakeport | Alano Club | 8:00 pm |

## ACOA

| FRIDAY | -0- | Lakeport | Christian Parish Church | Noon |

## INCEST SURVIVOR'S ANONYMOUS

| SUNDAY | -0- | Lakeport | Alano Club | 7:00-8:30 pm |
| THURSDAY | -0- | Kelseyville | Presbyterian Church | 7:00-8:30 pm |

## CODA - Codependency Groups

| MONDAY | -0- | Lakeport | Alano Club | 7:30-9:00 pm |
| WEDNESDAY | -0- | Cobb Mtn. (Women only) | Call 928-5727 | 9:00-10:30 am |

## OVEREATERS ANONYMOUS

| MONDAY | -0- | Middletown | Community Church | 7:00 pm |
| TUESDAY | -0- | Clearlake | Autumn Village Comm. Rm. | 7:00 pm |
| *TUESDAY | -0- | Nice | North Shore Resort | 6:00 pm |
| *THURSDAY | -0- | Nice | North Shore Resort | 7:00 pm |
| SATURDAY | -0- | Lower Lake | Redbud Hospital | 10:00 am |

## SEX & LOVE ADDICTS ANONYMOUS

| THURSDAY | -0- | Nice | North Shore Resort | 6:00 pm |
| Women only | | | | |

## EMOTIONS ANONYMOUS

| TUESDAY | -0- | Nice | North Shore Resort | 6:00 pm |

## OTHER:

| TUESDAY | | Lakeport: Native American Support | Scotts Valley Office 6:30-7:30pm Everyone Welcome Steve:  263-4771 | |
| TUESDAY | | Lakeport: Teen AA Meeting | Alcohol & Drug Serv. 4:00-5:00pm AODS:  263-8162 | |
| WEDNESDAY | | Lakeport: Tough love Meetings | Sutter Lakeside Hospital Gregg:  262-5026 | 7:00-9:10pm |
| THURSDAY | | Clearlake: Christian 10-Step for A/D | Calvary Chapel Memory Ln. off of Olympic | 7:00pm |
| THURSDAY | | Clearlake: ROFFA(Chemical Depend) | Calvary Baptist Rick:  994-4030 | 7:00-8:30pm |
| THURSDAY | | Clearlake Oaks Support Grp. For/Alcohol Prob. | The Grange | 7:30-9:30pm |
| FRIDAY | | Lakeport: Gamblers Anonymous | Alcohol & Drug Serv. AODS:  263-8162 | 7:00pm |

## INTERESTED IN OTHER GROUPS?

**Contact:  Alcohol & Other Drug Services:**
LAKEPORT 263-8162 OR -- CLEARLAKE 994-7617.

\* - Non-Smoking
O - Open meeting, anyone can attend.
C - Closed meeting for alcoholics or addicts only.

D-11

## ADDRESSES:

| City | Location | Address/Phone |
|------|----------|---------------|
| CLEARLAKE | Assembly Of God | 4472 Snook Ave/994-3122 |
| CLEARLAKE | American Legion Hall | 14770 Austin/994-8115 |
| CLEARLAKE | Redbud Hospital | 18th Ave & Hwy 53/994-6486 |
| CLEARLAKE | Queen of Peace Catholic Ch. | 14405 Uhl Ave/994-6618 |
| CLEARLAKE | Methodist Church | 14521 Pearl St/994-2134 |
| CLEARLAKE | AODS Center/South | 7000 B Hwy 53/994-7617 |
| CLEARLAKE | First Baptist Church | 14500 Pearl/994-5148 |
| CLEARLAKE | Church Of Latter Day | 14970 Lakeview Way/994-9607 |
| CLEARLAKE | Calvary Chapel | 14330 Memory Ln/994-5643 |
| CLEARLAKE | Calvary Baptist Church | 15005 Lakeside Dr/994-4030 Past Austin Resort, Trn Rght. |
| CLEARLAKE OAKS | Methodist Church | 12476 Plaza St. |
| CLEARLAKE OAKS | Eastlake Grange | 727 E Hwy 20/998-9920 |
| KELSEYVILLE | United Methodist Church | 1st & Main/279-4664 |
| KELSEYVILLE | Gard Street School | 3980 Gard St. |
| LAKEPORT | Alano Club | 325 Todd Rd/263-8545 |
| LAKEPORT | AODS Center/North | 858 Lakept Blvd/263-8162 |
| LAKEPORT | Christian Church | 745 Brush St/263-4788 |
| LAKEPORT | Scotts Valley Tribal Office | 149 N. Main Ste200/263-4771 |
| LAKEPORT | St Johns Episcopal | 1190 N. Forbes/263-4785 |
| LAKEPORT | Sutter Lakeside Hospital | 5176 Hill Rd./262-5000 |
| LOWER LAKE | AA Central Office | Silver Plaza/995-3316 9800 Hwy. 53, Suite D |
| LOWER LAKE | Methodist Church | 16255 2d./994-2507 |
| LUCERNE | Community Clubhouse | 6325 E Hwy 20/274-9964 |
| MIDDLETOWN | Senior Center | 15299 Central Pk/987-3113 |
| MIDDLETOWN | Salesian Campground | Hwy. 175 near Socrates Mine Rd. |
| MIDDLETOWN | 12-Step House | 2119 Stewart&Douglas/987-2198 |
| NICE | North Shore Resort | 2345 Lakeshore Blvd/274-7771 |

doc:    AALIST/ka

UPDATED: 10-18-95

D~12